■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WALTER SPRINGER, Appellant.—Appeal by the defendant, as limited by his brief, from a judgment of the Supreme Court, Queens County (Clabby, J.), rendered July 19, 1983, convicting him of robbery in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial (Rotker, J.), of the defendant's motion to dismiss the indictment due to the destruction of potentially exculpatory material.

Judgment reversed, on the law, the defendant's motion to dismiss the indictment granted, indictment dismissed and matter remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

At approximately 3:00 P.M. on January 7, 1982, three men wearing hooded sweatshirts entered an Arby's restaurant on Linden Boulevard in Queens. The men waited by the door for

a few minutes until all of the customers left. One of the men then approached the register and placed an order. After receiving the order, the three men went into the bathroom. A few moments later, two of the men returned to the register, and at that time, according to a cashier, the taller of the two men, who was wearing a gray hooded sweatshirt, pulled out a gun and instructed her to give them all of her money.

The cashier testified at the trial that she was approximately 5 feet 6½ inches tall and that this man was much taller than she was, probably about 6 feet 2 inches. She did not see his face, however, because the robbers had instructed her not to look at them. The robbers also took money from another cashier.

While the holdup was in progress, the restaurant manager came downstairs from the second floor of the store and entered the area behind the register. From a distance of about 6 to 9 feet, the manager was able to observe, for about 5 or 10 seconds, the face of the man wearing the gray sweatshirt and holding the gun. The hood of his sweatshirt was drawn tightly around his head so that his hair and ears were not visible, and the shape of his head was obscured; the manager could see only his eyes, nose and mouth. At that distance, the manager, who testified that she was 5 feet 6 inches or 5 feet 7 inches tall, stated that she made eye contact with the robber with the gun. She later estimated his height at 5 feet 7 inches or 5 feet 8 inches, and further described him as having a small goatee. The original police report, however, indicated that the suspect was approximately 6 feet 2 inches.

At the time of the robbery, the Arby's restaurant in question was equipped with a Polaroid-type camera, which was mounted about five feet above the counter. It was triggered by the removal of a bill from any of the cash registers, and would pivot so that it would photograph all of the registers. During the instant robbery, the camera took approximately 10 photographs, all of which were handed over to the police on the day of the crime.

On February 12, 1982, over a month after the Arby's robbery, the defendant and several other individuals were arrested in Brooklyn on weapons possession charges. The arrest report states that the defendant's height is 5 feet 5 inches. Subsequently, the defendant and the others were identified as persons involved in a series of Brooklyn robberies.

Detective John Skala obtained photographs of the defendant

and the others who were arrested with him, and on or about February 15, 1982, exhibited them to the restaurant manager in a batch of approximately 30 photos. She identified the defendant's photograph as that of the man in the gray sweatshirt who displayed the gun, but could make no other identification. The defendant was thereafter arrested for the Arby's robbery.

As part of an omnibus motion made in June 1982 the defendant demanded, *inter alia,* any evidence or information that might be considered *Brady* material *(see, Brady v Maryland,* 373 US 83), that is, material that might tend to be exculpatory. Defense counsel was not then informed of the existence of the surveillance photographs. The fact that the surveillance camera had taken photographs of the robbery was not discovered until the *Wade* hearing in October 1982. At that time it was also learned that Detective Skala had discarded these photographs. In explanation of his actions, Skala stated that he believed that the photographs showed nothing that would be of value in an identification procedure.

At the conclusion of the *Wade* hearing, the hearing court (Chetta, J.), ruled only on the identification issue, and not on the *Brady* issue. The court then suppressed the restaurant manager's photographic identification of the defendant, principally on the ground that the array shown to her had not been properly preserved, but further found that an independent source existed for her in-court identification.

Shortly thereafter, the defendant moved to dismiss the indictment on the ground, *inter alia,* that the police had destroyed *Brady* material by discarding the photographs taken by the restaurant's surveillance camera. In support of his argument, the defendant pointed out that a face or part of a face allegedly had been visible in the photographs, and that the original police report indicated the robber's height to be 6 feet 2 inches, while the defendant is 5 feet 3 inches. That motion was denied by order dated January 10, 1983 (Rotker, J.).

Thereafter, the case proceeded to trial. Detective Skala testified that the surveillance photographs had been "blurred" and were of "poor quality", although he admitted that a profile of one of the robbers had been visible. As at the *Wade* hearing, Skala testified that he had discarded the photographs because they appeared to be of no value. He did not believe that a person's height could be ascertained from the photographs.

In contrast, the restaurant manager, who had also seen the surveillance photographs, testified that the images on them were clear, and that the heights of the robbers could be seen relative to the heights of the cashiers. She further testified that at least one of the photographs showed part of the face of the robber who wore the gray sweatshirt and carried the gun —the robber identified as the defendant. Although one of the two cashiers also testified, she was not able to make an identification, and only the restaurant manager's identification of the defendant connected him to the robbery.

The destruction by the police of the surveillance photographs, which constituted potential *Brady* material, requires reversal of the conviction and dismissal of the indictment. "Under *Brady v Maryland (supra)*, the prosecution is required to disclose, in advance of trial, evidence which is favorable to the accused. In order to safeguard the defendant's rights under *Brady*, the prosecution, as well as law enforcement officials, are under a duty to diligently preserve all materials which may be subject to disclosure *(United States v Bryant*, 439 F2d 642). It is not for the prosecution, or the police, to select which materials should be preserved, and which should be destroyed. Were law enforcement officials empowered to pick and choose the materials deemed worthy of preservation, then the due process rights guaranteed by *Brady* would be shallow indeed; *Brady* could be circumvented by merely destroying evidence unfavorable to the prosecution before it is demanded by the defendant (see, *United States v Bryant*, *supra*, p 648)" *(People v Saddy*, 84 AD2d 175, 178; *see, People v Kelly*, 62 NY2d 516, 520).

It is clear that, in the instant case, the police misconduct in destroying the surveillance photographs violated the requirements and the spirit of *Brady v Maryland* (373 US 83, *supra)*, and *United States v Bryant* (439 F2d 642, *supra)*. Here, as in *People v Saddy (supra)*, which concerned the erasure of tape-recorded conversations, the evidence has been irretrievably lost. It will never be known what the photographs showed, nor how clearly the perpetrators were depicted. They may have established a significant difference between the height of the defendant and the heights of the perpetrators.

In determining whether the prosecution should be sanctioned for the destruction of the potential *Brady* material, this court must consider " 'the degree of negligence or bad faith [on the part of law enforcement officials], the importance of the evidence lost, and the evidence of guilt adduced at trial' " *(People v Saddy, supra*, at p 179, quoting from *United States v*

*Bryant, supra,* at p 653). Here, as in *Saddy,* the loss of the surveillance photographs was not the result of negligence or oversight. They were deliberately discarded by a police detective, based solely on his own judgment and his personal determination that they were not useful. While we cannot say, on this record, that the detective was motivated by bad faith, we must note the discrepancy between his description of the photographs as "blurry", and the restaurant manager's assessment that the images thereon were clear, and that the photographs could be useful in determining the heights of the perpetrators.

Finally, the destroyed evidence was relevant on the sole critical issue in this one-witness identification case, namely, the identity of the robber. Other than the identification testimony of the restaurant manager, virtually nothing connected this defendant to the crime. For this reason, it can hardly be said that the evidence against the defendant was overwhelming.

Addressing the issue of an appropriate sanction, while we are aware that "the drastic remedy of dismissal should not be invoked where less severe measures can rectify the harm done by the loss of evidence" *(People v Kelly,* 62 NY2d 516, 521, *supra),* we are compelled to conclude, that in this case, the only appropriate remedy is reversal of the conviction and dismissal of the indictment, as the defendant has been deprived of material with great potential value to his defense, and there is no other remedy available. Mollen, P. J., Rubin, Eiber and Kooper, JJ., concur.