OPINION OF THE COURT
Michael R. Juviler, J.
This is a decision after a hearing on a motion to vacate judgment under CPL 440.10. The defendant had been found guilty by a jury of murder in the second degree, and on August 10, 1987, I sentenced him to imprisonment for 24 years to life. The motion is granted for two reasons: (1) The People failed to turn over to the defense a "DD5” report prepared by the detective in charge of the investigation, which the defense had an absolute right to see because the detective testified for the People and his report related to the subject of his testimony; (2) This report contained exculpatory information, which the defendant had the constitutional right to receive.
FINDINGS OF FACT

The Trial Evidence

On April 11, 1986, Anthony Joseph, a dealer in cocaine, was killed by three gunshot wounds in the head, in the living room of his apartment in Brooklyn, as his wife hid in a closet *583 in the adjoining bedroom. While the police were knocking on the apartment door she jumped out of the window, breaking both legs. The defendant was arrested for the crime on April 23.
At the trial Mrs. Joseph testified that when the deceased answered the intercom on April 11, a voice responded that it was "Todd,” and she recognized the voice to be that of "Todd,” the defendant. She also recognized the defendant’s voice inside the apartment, although she did not see him. Mrs. Joseph testified about his previous visits to the apartment and her familiarity with his voice. On cross-examination, Mrs. Joseph insisted that the voice on the intercom identified the visitor as Todd, not Ty or Tide, but she admitted having told the police on April 11 and April 13 that the voice had said Tide.
Detective Rudolph Stubbs, the detective in charge of the investigation, testified that when he arrived at the scene, he observed the deceased on the floor in the living room lying against a dinette chair. Near the body was a deformed .38 caliber bullet, and in the foyer was a deformed .22 caliber bullet. Fingerprints were lifted from the chair, but the chair and the deceased’s address book lying nearby were not vouchered. Stubbs also interviewed a neighbor in the building, Emmanuel Bowser.
The Crime Scene Unit dusted the scene for fingerprints; one print recovered from the chair matched the defendant’s fingerprint. However, the officers did not make a note of precisely where the print was found or of the direction of the print.
Bowser testified as a defense witness that at the time of the incident he had seen two men entering the building. He described them as black males, one 5 feet, 11 inches tall, the other 6 feet, 1 inch tall, each wearing a moustache and goatee, one wearing an earring, and at least one with a "Jersey” haircut. (Neither description fit the defendant.) No one showed Bowser photographs. The defense also called several alibi witnesses.

The Hearing Evidence

On the eve of the sentencing, a man named Quan Jackson telephoned the defendant’s lawyer and claimed that the defendant was innocent and that in July 1986, he had called the police Crime Stoppers Unit to tell them that two other men had killed Joseph. The defendant moved to vacate the judgment.
The hearing on the motion established that unknown to the *584 District Attorney, the defendant’s lawyer, and the court, on July 9, 1986, Detective Andrew Ware of the Crime Stoppers Unit had received an anonymous telephone call relating to this case. Ware gave the caller code No. 2015; the informant (now known to be Jackson) remained anonymous. This information was then relayed to Detective Stubbs, and on July 11 he reviewed the Crime Stoppers file and filled out a police report regarding this information, DD5 No. 17.
The DD5 No. 17 said that the caller had reported that Lumpkins did not murder Joseph and that Lincoln Davis and Ronnie McNeil were the murderers. He described Davis as a male black about 24 to 25 years old, 6 feet to 6 feet, 1 inch tall, 160 pounds, dark skin, wearing a moustache and goatee, with a Jersey haircut, and McNeil, also known as "Clyde,” as a male black, 25 to 26, 6 feet tall, dark skin, with a moustache and goatee. He gave their addresses and indicated that they may have been arrested together and imprisoned together at Eastern Correctional Facility. The caller alleged that the murderers had had an argument with Anthony Joseph over the weight of drugs they had bought from him; they were overheard making threatening remarks about Joseph, and later that day Joseph was killed. He said that McNeil had a "silver .38 pistol.” The informant claimed that Davis and McNeil were bragging that "everything was cool because China [Lumpkins] got caught.”
Attached to DD5 No. 17 were photographs of two individuals, Lincoln Davis and Ronald McMillan, with their dates of birth and NYSIS numbers. The report also noted that Detective Stubbs asked the Latent Fingerprint Unit for a comparison of the prints of the two individuals in the photographs with the prints taken from the crime scene.
Before the trial, all the police reports of Detective Stubbs known to the District Attorney were turned over to the defense. DD5 No. 17 was not discovered until after the trial.
THE ROSARIO ISSUE
In People v Rosario (9 NY2d 286, 289, cert denied 368 US 866) the court held that
"a right sense of justice entitles the defense to examine a witness’ prior statement, whether or not it varies from his testimony on the stand. As long as the statement relates to the subject matter of the witness’ testimony and contains nothing that must be kept confidential, defense counsel should *585 be allowed to determine for themselves the use to be made of it on cross-examination. * * *
"A pretrial statement of a witness for the prosecution is valuable not just as a source of contradictions with which to confront him and discredit his trial testimony. Even statements seemingly in harmony with such testimony may contain matter which will prove helpful on cross-examination. They may reflect a witness’ bias, for instance, or otherwise supply the defendant with knowledge essential to the neutralization of the damaging testimony of the witness which might, perhaps, turn the scales in his favor.”
This rule gives defense counsel "the opportunity to inspect a witness’ prior statement for possible use or leads on cross-examination,” without a preliminary finding by the trial court that the material would be useful to the defense. (People v Perez, 65 NY2d 154, 158.)
The rule, codified in CPL 240.45 (1) (a), requires disclosure of the notes and reports of a police witness made in connection with a defendant’s arrest (People v Malinsky, 15 NY2d 86), and a detective witness’s notes of his investigation. (People v Kass, 25 NY2d 123, 127; People v Gilligan, 39 NY2d 769.) Failure to turn over Rosario material until after the trial requires a new trial; "the courts will not attempt to determine whether any prejudice accrued to the defense. The failure constitutes per se error requiring that the conviction be reversed”. (People v Ranghelle, 69 NY2d 56, 63; People v Perez, 65 NY2d 154, supra.) The error may be alleged in a motion to vacate judgment; if the error is proved, the court must vacate the judgment, regardless whether prejudice to the defense was proved. (People v Novoa, 70 NY2d 490; People v Robinson, 133 AD2d 859.) The error is not excused by the People’s ignorance of the material or even by their good-faith effort to locate it. (People v Ranghelle, 69 NY2d, supra, at 63.)
In this case, Detective Stubbs’s DD5 No. 17 was precisely the kind of report required to be disclosed at the outset of the trial. Its author was a witness at the trial, so it was the statement of a witness, and the report related to his testimony, which dealt with his role as the detective in charge of the investigation of the homicide. The report went to the heart of that investigation. It related to his knowledge of the case and his pursuit of a lead. It went also to the heart of the defense. The theory of the defense was a mistake in the voice identification and a reasonable doubt from lack of evidence *586 because of the failure of the detective who conducted the investigation to preserve evidence or pursue leads involving other suspects, two of whom had appeared in the lobby just before the murder and were observed by the defense witness Bowser. That the People did not ask Stubbs to testify about the events described in his report does not remove the report from the class of Rosario material. (People v Perez, supra.)
In People v Gilligan (supra) the Court of Appeals ordered a new trial on similar facts. The defense lawyer’s request to inspect the written report by several police officers in the course of their investigation of the crime had been denied. The court took note of its "explicit holding in Malinsky * * * that a trial court 'may not allow the People to keep from the [defense] counsel statements or notes made by a witness upon the ground that nothing in them could assist the defense or that no prejudice would result from withholding them’.” (39 NY2d, supra, at 770.) Here, as in Gilligan, the defendant’s lawyer requested all reports by the investigating detective.
This case is also similar to People v Quinones (139 AD2d 404, lv granted 71 NY2d 1035) in which the Appellate Division for the First Judicial Department ordered a new trial because of the People’s failure to turn over to the defense papers regarding the arrest of the defendant and the complaining witness that had been prepared by the arresting officer, a witness at the trial.
The District Attorney contended that although the DD5 should have been disclosed, failure to comply does not require a new trial because Rosario (supra) applies only to the statements of witnesses and Quan Jackson was not a witness at the trial. This argument overlooks the role of Stubbs as the People’s witness. The prosecutor having chosen to call him to assist in proving the People’s case, the People were obliged to turn over all of his statements, including his reports, relating to the subject matter of his testimony.
The "per-se” aspect of the Rosario-Ranghelle rule has been criticized. This court is not empowered to reopen the debate. In this case the rule easily could have been followed. Stubbs’s file containing DD5 No.17 was in his possession in the trial prosecutor’s office a week before the trial, during the pretrial hearing; twice more before the trial; and twice during the trial. Despite the previous discovery, reasonable trial preparation by the new Assistant District Attorney in the case would have included an examination of the entire file of the detec *587 tive responsible for the investigation. (See, People v Novoa, 70 NY2d, supra, at 495, 499; People v Quinones, supra.)
THE BRADY ISSUE
The defendant has a "constitutional right to be informed of exculpatory information known to the State (see, Brady v Maryland, 373 US 83)”. (People v Robinson, 133 AD2d 859.) The Appellate Division recently summarized the law on this subject, in People v Alongi (131 AD2d 767, 768): "The prosecution is under a constitutional duty to disclose to the defense evidence favorable to the defendant that is material to either guilt or punishment (see, Brady v Maryland, supra; United States v Bagley, 473 US 667, 674-675). * * * There is, however, 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case’ * * * and '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality” in the constitutional sense’ (United States v Agurs, 427 US 97, 109-110). Rather, '[constitutional error occurs only if the evidence which was not disclosed was material in the sense that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different” ’ (People v Chin, 67 NY2d 22, 33, quoting from United States v Bagley, 473 US 667, 682, supra). ”
Even if exculpatory information is known only to the police, the People cannot avoid responsibility for its suppression; in that situation, knowledge of one law enforcement agency is attributable to the other. (Barbee v Warden, 331 F2d 842; People v Maynard, 80 Misc 2d 279; People v Richter, 102 Misc 2d 285.) " '[S]eparateness of offices’ cannot excuse the failure to learn of’ the exculpatory information. (See, People v Novoa, 70 NY2d 490, 498, supra, quoting Giglio v United States, 405 US 150, 154.)
The People argue that the violation of the requirement to disclose Brady material requires a new trial only if the material is "evidence,” and the information about Jackson’s allegation was hearsay — Jackson being unavailable to testify —and therefore not admissible in evidence. They contend also that the detective acted in good faith, because he had reason to discount the report and consider the case already solved. I reject these arguments.
*588 Although I have found no reported decisions dealing with suppression of leads to possible exculpatory evidence, it can hardly be doubted that the requirement of due process underlying the Brady rule includes disclosure of exculpatory leads, particularly those whose exculpatory potential is as clear as that of the telephone call to Crime Stoppers. Perhaps that is why the courts applying the Brady rule have spoken of "exculpatory information” (People v Stanard, 42 NY2d 74, 85; People v Robinson, supra); "exculpatory material” (People v Simmons, 36 NY2d 126, 131; United States v Agurs, supra; People v Brown, 67 NY2d 555; People v Cortijo, 70 NY2d 868, 870); and "exculpatory matter” (People v Alongi, supra, at 768). Courts have dismissed indictments after convictions because of destruction or loss of evidence by the police, when that police conduct has deprived a defendant of "potential” Brady material (People v Springer, 122 AD2d 87, 90 [surveillance photograph of a robbery; conviction reversed and indictment dismissed] [emphasis added]; People v Pantino, 106 AD2d 412, 413 [drug indictment dismissed after trial because police lost tape recordings of telephone conversations between a police witness and the defendant that "may well have constituted Brady material”]; People v Saddy, 84 AD2d 175, 178-179 [counts alleging sales of drugs dismissed after trial because the police had erased tape recordings that "may well * * * have substantiated” the defense of agency]). Clearly, Brady (supra) applies to withholding of material with high exculpatory potential, and a conviction can be tainted even if the defense cannot produce exculpatory evidence in court.
That happened here. There was "substantial basis” for Detective Stubbs "to believe that the undisclosed witness could provide material testimony favorable to the defendant”. (See, People v Alongi, 131 AD2d, supra, at 768.) It is true, as the prosecutor pointed out at the hearing, that the detective had a positive voice identification and a fingerprint incriminating the defendant, and the informant who called Crime Stoppers had not come forward, but still there was a duty to disclose the information to the defense. "Even if’ the detective "had valid reasons to consider this witness to be unreliable, [he] should nonetheless have provided the defense with this important exculpatory information which was clearly Brady material (see, People v Fein, 18 NY2d 162, 172, appeal dismissed and cert denied 385 US 649).” (See, People v Robinson, 133 AD2d, supra, at 860.) Stubbs knew that the descriptions of the two suspects provided by the informant matched the *589 descriptions of the two men provided by Emmanuel Bowser. And any reasonable police officer would have concluded that if the informant was sincere, the suspects were the two men seen by Bowser.
Contrary to the argument of the People, I find that the detective did not act in good faith. His testimony at the hearing that he reported and checked out Jackson’s story was disproved by the Assistant District Attorney, Stubbs’s police colleagues, and his own paperwork, and I find that his testimony was false and was designed to justify his failure to follow up the Crime Stoppers information. Contrary to what he told Crime Stoppers, he did not investigate the report or try to find the two suspects named in it. He did not show the photographs to the two witnesses, Mrs. Joseph and Mr. Bowser; his only use of the information was to request a fingerprint comparison. Despite his frequent contact with the Assistant District Attorney for trial preparation he did not tell him about the Crime Stoppers call or show him the DD5.
The People appropriately conceded at the hearing that the defendant had the right to be informed of the exculpatory information, but contended that because of Jackson’s failure to come forward there is no reasonable probability that the result of the trial would have been different even if the disclosure had been made.
The requirement of a showing of a "reasonable probability” of a different result "does not mean that the defendant must be able to show that the evidence would 'probably lead to an acquittal,’ which is the standard that must be met for the granting of a new trial on the basis of newly discovered evidence from source other than the government”. (United States v Srulowitz, 785 F2d 382, 388; see, CPL 440.10 [1] [g].) Instead, as the Supreme Court of the United State has made clear, a reasonable probability suffices, and a reasonable probability " 'is a probability sufficient to undermine confidence in the outcome’ ” of the case. (Pennsylvania v Ritchie, 480 US 39, 57, quoting United States v Bagley, supra, at 682; Strickland v Washington, 466 US 668, 694; Miller v Angliker, 848 F2d 1312 [2d Cir, May 20, 1988].)
If the undisclosed DD5 No. 17 is viewed solely as material to impeach or neutralize the testimony of Detective Stubbs, this standard of materiality would not be met. (It is a paradox that the Brady claim requires an assessment of prejudice, while the Rosario claim does not.) It is doubtful that even if the *590 detective had not testified as a witness for the People, the outcome would have been different, or confidence in the outcome would be undermined for that reason.
The suppressed information had greater significance, for it fit in exactly with the defense theory, namely, that the two men observed in the lobby by Bowser were the culprits, and that the police had negligently failed to pursue potential leads involving suspects other than the defendant. It might well have been in the best interest of the defense to cross-examine Stubbs about the bad faith of his investigation, not merely to impeach his direct testimony, but to create a reasonable doubt. (See, People v Smith, 127 AD2d 864, 866.) The defense also was deprived of the opportunity to decide whether to show photographs of Davis and McNeil to Bowser or to Victoria Joseph, to call McNeil and Davis to the stand with the opportunity to have them claim their privilege against self-incrimination in front of the jury (see, People v Owens, 22 NY2d 93, 98), to impeach Victoria Joseph’s testimony that Todd Lumpkins was the only person who came to the apartment to visit the deceased in the period immediately before the shooting, to seek to refresh her recollection on that subject, or to use the report as a lead to cross-examination of Mrs. Joseph about other friends of the deceased who might have had arguments with him over drugs. (Ignorant of the report, the trial assistant even insisted at the close of the direct examination that there were no such suspects.)
The reasoning of the Appellate Division in People v Robinson (supra) governs this case. In Robinson, during the investigation of the murder of which the defendants were convicted, the police obtained a statement from a person who implicated three other men as the criminals, and the prosecution did not disclose it to the defense. Despite the strength of the People’s case, which included three witnesses who identified the defendants as the perpetrators, two of whom had seen them on previous occasions, and another witness who testified about overhearing the defendants discussing their participation in the crime shortly after it happened, the court found "a reasonable probability that the result * * * would have been different if the jury had heard testimony from a witness who, in effect, would have identified three other men as the actual perpetrators.” (133 AD2d, supra, at 860.) In Robinson, the witness gave the defendants an affidavit supporting their motion to vacate judgment, "and presumably would have been willing to testify on their behalf at the trial.” (Supra, at 860.) *591 In the present case, the witness has declined to come forward. Nevertheless, Robinson supports a new trial in this case, for the Appellate Division strongly suggested that even without the testimony of the witness, there was ground to vacate the judgment: "At the very least, the defendants in this case, who were evidently, unaware that this witness had given such exculpatory information, were 'deprived of the opportunity to make an informed decision regarding the trial strategy that would have been in [their] best interests to pursue’ (People v Smith, 127 AD2d 864, 866).” (Supra, at 860.)
Similarly, in People v Smith (supra), quoted in Robinson (supra), the court found that the failure to disclose evidence of a possible conspiracy by the police against the defendant deprived the defense of the opportunity to use the information in its trial strategy, so that a new trial was ordered.
Moreover, while the evidence of the guilt of Todd Lumpkins was clear, it was not overwhelming. The identifying witness had been inconsistent in her telling of the suspect’s name, and she had been rendered somewhat difficult and hysterical by the ordeal. The incriminating fingerprint was far from conclusive: the detective had failed to preserve the chair, and the available physical evidence did not rule out the defendant’s having innocently put his finger on the chair on one of his visits to talk with the victim at the dinette table. The People’s case was also opposed by Bowser’s testimony, by the uncontradicted defense evidence that neither of the two men he had seen resembled the defendant, and by the alibi.
In addition, there was no dispute at the end of the hearing that "Quan Jackson,” whatever his true name and identity, was an actual person other than the defendant. Despite the possibility of a contrivance,- I still find sufficient grounds to consider his call to Crime Stoppers a potential lead to genuine evidence of the defendant’s innocence.
For all of these reasons, after carefully considering all of the evidence at the hearing, I find that the undisclosed information, even without an appearance or affidavit by Quan Jackson, is sufficient to undermine confidence in the outcome of the trial, and to warrant a new trial.
In assessing the materiality of the undisclosed information, in terms of its undermining of confidence in the outcome of the trial, the court must consider also the bad faith of the detective. In People v Fein (18 NY2d, supra, at 173) the Court of Appeals, interpreting Brady v Maryland (supra), said that *592 although suppression of exculpatory evidence by the prosecution does not automatically require a reversal, "The defendant is entitled to a fair trial without trickery or overreaching by the prosecution, and the question is whether the prosecutor’s conduct negated that right. The principle is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused”. The same conclusion applies to misconduct by the police. In determining whether this right to a fair trial without trickery or overreaching by law enforcement officers has been denied, the court may well have to balance the showing of prejudice against " 'the degree to which the conduct of the trial has violated basic concepts of fair play.’ ” (18 NY2d, supra, at 174; see also, United States v Keogh, 391 F2d 138, 146-147.)
The same kind of balancing takes place in cases applying Brady (supra) in which the police have destroyed evidence or failed to preserve it, a situation analogous to that here, where Stubbs’s conduct denied the defense a timely opportunity to pursue a substantial lead or adjust the tactics of the defense if the informant could not be found. "[WJhere discoverable evidence is lost, the People face the imposition of sanctions unless they sustain their heavy burden of establishing that diligent, good-faith efforts were made to prevent the loss of such evidence * * *. The severity of the sanction to be imposed will depend upon the degree of negligence or bad faith exhibited by law enforcement officials, the importance of the evidence lost and the evidence of guilt adduced at trial”. (People v Haupt, 128 AD2d 172, 174-175, affd 71 NY2d 929 [1988]; People v Saddy, 84 AD2d 175, 179, supra; People v Springer, 122 AD2d 87, 90-91, supra.)
Applying that reasoning to the present case, I find that the appropriate sanction is to afford the defendant a new trial, at which he may seek to present the testimony of Quan Jackson, or, in the absence of that testimony, to prove to the jury the bad faith of the detective in charge of the investigation, with appropriate instructions to the jury that they may draw an adverse inference against the People for the failure to provide the information to the defense. (See, People v Kelly, 62 NY2d 516, 521; People v Emmons, 99 Misc 2d 941, 943; cf., People v Martinez, 71 NY2d 937.) The People would have the opportunity themselves to produce Jackson or prove the falsity of his report. This will restore the "defendant’s constitutional right to a fair trial” by giving him "a meaningful opportunity to use the allegedly exculpatory material to cross-examine the Peo *593 pie’s witnesses or as evidence during his case”. (See, People v Cortijo, 70 NY2d 868, 870, supra.)
The defendant’s motion to vacate the judgment of conviction is granted, the judgment is vacated, and a new trial is ordered.