**STATE of Missouri, Respondent,**

v.

**Tyrone G. PARKER, Appellant.**

**No. WD 52112.**

Missouri Court of Appeals, Western District.

Aug. 15, 2006.

Mark A. Thomason & Phillip Ray Gibson, Blue Springs, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun Mackelprang and Evan Buchheim, Office of Attorney General, Jefferson City, for respondent.

PAUL M. SPINDEN, Judge.

We consider this case a second time. We first considered it in 1998 as a purported consolidated appeal of the circuit court's judgment convicting Tyrone G. Parker of second-degree murder and armed criminal action and of its judgment denying Parker's Rule 29.15 motion for a post-conviction remedy. Because Parker did not did not raise any contentions of trial error, we dismissed his direct appeal and considered only his appeal of the circuit court's denial of his Rule 29.15 motion. *State v. Parker,* 972 S.W.2d 508 (Mo.App.1998). This court recalled its mandate on December 21, 2004, after Parker alleged that the prosecuting attorney had not disclosed material, exculpatory evidence and that his appellate attorney had been ineffective in not raising any issues of trial error.

Parker raises two points in this second appeal. Both aver that the prosecuting attorney withheld material, exculpatory ev-idence. He asserts, on the authority of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Bebee,* 577 S.W.2d 658 (Mo.App.1979), that the prosecuting attorney's withholding of evidence deprived him of his due process rights guaranteed by the United States and Missouri constitutions and that he should be granted a new trial. Parker has asked this court to remand the case to the circuit court to adjudicate his claims that the prosecuting attorney withheld material, exculpatory evidence.

The criminal charges against Parker grew out of a drive-by shooting in Kansas City on August 12, 1993, in which an 11–month–old infant was killed and three persons were wounded. We set out the details of the incident in our previous decision in *Parker,* 972 S.W.2d at 508. A jury convicted Parker of aiding and abetting in the infant's murder and the wounding of the three persons. In this appeal, Parker contends that he has discovered statements by witnesses that were not disclosed to him before his trial. He avers that the statements would have corroborated his contention that, while he was a passenger in a car that drove past the house on the night of the shooting, no one in the car was involved in the shooting and that the house was "black" and "dark" when he went by it.

A prosecuting attorney has a broad duty "to disclose evidence in [his or her] possession that is favorable to the accused and material to guilt or punishment." *State v. Goodwin,* 43 S.W.3d 805, 812 (Mo. banc), *cert. denied,* 534 U.S. 903, 122 S.Ct. 234, 151 L.Ed.2d 168 (2001) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). A prosecuting attorney violates due process if (1) he or she does not disclose evidence that is favorable to the accused because it is either exculpatory or im-

peaching, (2) the prosecuting attorney has suppressed the evidence, either intentionally or inadvertently, and (3) the undisclosed evidence is material. *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

The courts have been less than articulate in describing what constitutes material evidence. The United States Supreme Court has declared that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Goodwin*, 43 S.W.3d at 812. It has instructed that, in evaluating materiality, "the question is 'whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (citation omitted). But, it has explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ The materiality standard is lower than the one that we would employ in cases of newly-discovered evidence in which we would reverse judgment and order a new trial only if the new evidence would have changed the outcome of the original trial. *Hancock v. Shook*, 100 S.W.3d 786, 798 (Mo. banc 2003). But the standard is higher than the typical "harmless error" standard applied in other cases. The United States Supreme Court has rejected the notion that every nondisclosure is automatic error. *United States v. Augurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Instead, it has declared that a prosecuting attorney has a duty to disclose only evidence that is "so clearly supportive of a claim of innocence that it gives [him or her] notice" of an obligation to disclose the evidence to the defendant. *Id.* at 107, 96 S.Ct. 2392.

■ Precisely where the *Brady* standard of materiality lies—somewhere between the newly-discovered evidence standard and the "harmless error" standard—is difficult to formulate. The United States Supreme Court seems to be prompting us to ask whether or not the purportedly undisclosed evidence would have been significant to the defendant in the way that he tried his case: Would it have provided him with plausible and persuasive evidence to support his theory of innocence or would it have enabled him to present a plausible, different theory of innocence? If either question can be answered affirmatively, the evidence is material under a *Brady* analysis.

Before considering the merits of Parker's claim, we consider the state's motion to dismiss a portion of the supplemental legal file in which Parker set out what he contends was undisclosed evidence. The state complains that, after Parker obtained an order from this court recalling its mandate and granting him an opportunity to raise issues of trial error, he submitted to the circuit court a motion for new trial to which he attached the allegedly undisclosed evidence. He then included the motion and the attached documents to the supplemental legal file in this appeal. The state contends that this court cannot consider the documents because they were not properly before the circuit court.

We concur that Parker's motion for new trial was improper, but we understand the reason for Parker's returning to the circuit court to seek its acting on his motion for new trial: He feared that we would not

have a proper record to conduct a meaningful review. And, indeed, we do not have a proper record because a fact-finder has not determined any of the three elements of *Brady*. A fact-finder has not determined even whether or not the prosecuting attorney suppressed the disclosure of statements. Parker does not attempt to establish that the prosecuting attorney suppressed the statements beyond submitting an affidavit indicating that certain statements were not in the file of Parker's attorney.

Missouri's appellate courts have considered *Brady* claims raised for the first time on direct appeal but only when the appellate court had a proper record to consider or where the facts were uncontroverted. *E.g., Hayes v. State,* 711 S.W.2d 876 (Mo. banc 1986); *State v. Patterson,* 618 S.W.2d 664 (Mo. banc 1981). Indeed, as the Supreme Court noted in an ancillary comment in *Weeks v. State,* 140 S.W.3d 39, 42 n. 2 (Mo. banc 2004), "[A claim that the prosecutor purposely hid what he knew was exculpatory evidence] is more appropriately addressed in the context of a habeas corpus motion in which the prosecution's serious alleged violation of *Brady* . . . can be explored."

■ On their face, however, Parker's allegations make a palpable *Brady* claim. He contends that the prosecuting attorney did not disclose to him the statement of Kenneth Wesley to police on the night of the shooting that he saw the car from which the shooter fired his shots and that it was a dark blue car, possibly a 1988 Cadillac. This evidence could have been significant in supporting Parker's contention that, while he drove by the site of the shooting, he was not in the shooter's car. Parker also complains that the prosecuting attorney did not disclose to him the statements to police by three women who were inside the house where the shooting oc-

curred. The women said that the victims of the shooting who were in the yard all went inside the house after the shooting. This evidence could have been significant in supporting Parker's testimony that, when he rode down the street past the shooting victims' house, the house was "black" and "dark" and that he did not see anyone outside.

■ "Where the submission of written affidavits raises genuine issues of material fact and where, as here, the *Brady* claims . . . are neither frivolous nor palpably incredible, an evidentiary hearing should be conducted." *United States v. Dansker,* 565 F.2d 1262, 1264 (3d Cir.1977). We, therefore, remand the case to the circuit court with instructions that it convene a hearing to consider Parker's *Brady* claims. It shall determine whether or not the prosecuting attorney suppressed disclosure of any statements to Parker. If it determines that the prosecuting attorney did suppress disclosure of statements, it shall determine whether or not the statements would have been favorable to Parker's defense—that is, whether or not they would have provided exculpatory evidence or a basis for impeaching the state's witnesses, and it shall determine whether or not the statements are material in accord with the standard set out above. If it decides these issues in the affirmative, it shall order a new trial of the state's charges against Parker. If it determines any one of the elements in the negative, it shall enter judgment denying Parker's claim.

HAROLD L. LOWENSTEIN, Judge, concurs.

JOSEPH A. ELLIS, Presiding Judge, dissents in a separate opinion.

JOSEPH M. ELLIS, Judge, dissenting.

I acknowledge at the outset that I have little if any criticism of the majority opin-

ion and I concede that the majority's disposition of the appeal has substantial support in the case law. But this is one of those unique cases, brimming with factual and procedural twists spanning thirteen years, where there is another disposition that, likewise, is amply supported by the case law. In my view, this latter disposition is more appropriate, and for this reason, I respectfully dissent.

## I.

As will be explained in detail *infra*, this Court has a sufficient record before it at this time to decide Parker's *Brady* claims,[1] it has the authority to do so, and should do so for the sake of judicial economy as well as the expeditious resolution of issues dating back some thirteen years. And there is significant case law supporting this conclusion.

In *State v. Patterson*, 618 S.W.2d 664 (Mo. banc 1981), "a promise of dismissal in return for testimony was discovered after trial but while the case was on direct appeal [to the Missouri Supreme Court], when the promise was entered on the dismissal form" filed with the trial court in the interim. *Hayes v. State*, 711 S.W.2d 876, 880 (Mo. banc 1986); *see also Patterson*, 618 S.W.2d at 665 & n. 1. Addressing the issue for the first time on appeal, the court found that the State had failed to disclose to the defendant the material fact that it had agreed to dismiss second-degree burglary and stealing charges against one of the State's chief witnesses against the defendant (Timothy Woodcox) in exchange for his testimony against the defendant at trial. *Patterson*, 618 S.W.2d at 665. The court observed that Woodcox provided damaging testimony against the defendant at trial. *Id.* In addition, the State presented the testimony of a police officer who said that, while he was questioning the defendant, the defendant made an oral confession to the charged crimes. *Id.* As to the materiality of the undisclosed deal made by the State with Woodcox, the court found that his "credibility as a witness was ... a significant issue in the case," further noting: "That Woodcox made a deal with the prosecutor is clearly important in judging his credibility and the jury was entitled to hear about it." *Id.*

On direct appeal, the *Patterson* court "ordered a new trial even though the defendant had given a confession." *Hayes*, 711 S.W.2d at 880. In reversing the defendant's conviction and remanding for a new trial, the court in *Patterson* stated:

> Defendant was prejudiced by not having this information. In making this observation we are not questioning the sufficiency of the confession to support the verdict once the jury believes the testimony as to the confession. *We are, rather, looking at what may have influenced the jury to accept the testimony as to the confession in the first place.*

618 S.W.2d at 665 (emphasis added). Therefore, in *Patterson*, the Missouri Supreme Court not only addressed a *Brady* claim raised for the first time on appeal, but reversed and remanded for a new trial on the basis of evidence initially presented to the appellate court, rather than first to the trial court.

The Missouri Supreme Court's decision in *Hayes* is also instructive. There, the defendant filed a Rule 27.26 motion for post-conviction relief in which he raised a *Brady* claim. *Hayes*, 711 S.W.2d at 877. Although the motion court denied the motion, it "made no finding at all on the issue of materiality." *Id.* at 879. After considering the possibility of remanding the case to the motion court for further findings on the *Brady* claim, *id.* at 879–80, the court

---

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

opted to rule the matter directly without remand for findings by exercising its "discretion to decide the case on the record before us." *Id.* at 880. In so doing, the court noted that this disposition was consistent with what occurred in *Patterson. Id.* After addressing the issue and concluding that the prosecutor withheld from the defendant material evidence within the holding of *Brady,* the court reversed the judgment of the motion court denying the defendant's Rule 27.26 motion and remanded with directions to vacate the judgment and sentence and to afford him a new trial. *Id.*

The Eastern District's decision in *Buck v. State,* 70 S.W.3d 440 (Mo.App. E.D. 2000), provides further support for granting Parker direct relief on appeal. The *Brady* nondisclosure in *Buck* was the State's failure to advise the defense that a key prosecution witness (Bill Braddy) had six previous criminal convictions, where the State had, by its own admission, disclosed only one of those convictions. *Id.* at 443. Although the defendant's direct appeal had evidently been finally decided against him before the defendant learned of the prosecutor's nondisclosure, his Rule 29.15 motion for post-conviction relief had not yet been litigated. *Id.* at 442, 445. Buck attempted to raise the *Brady* issue in his Rule 29.15 motion and then again in his appeal from the motion court's denial of that motion. *Id.* at 445. The State objected, claiming that Buck should have raised the issue in a motion for new trial or on direct appeal and that such issues are not cognizable in the context of a Rule 29.15 motion or an appeal from the denial of such a motion. *Id.* While the Eastern District recognized the logic of the State's position, the court proceeded to say: "Buck, however, cannot be faulted for failing to raise the nondisclosure of evidence that he did not know about." *Id.* "Buck's Rule 29.15 motion represents his only op-portunity to correct the prosecutor's non-disclosure." *Id.* at 446. The *Buck* court concluded:

> The State argues that Buck's claim is one of trial error, and is therefore not cognizable in a Rule 29.15 motion except where fundamental fairness requires, and then only in rare and exceptional circumstances. *State v. Carter,* 955 S.W.2d 548, 555 (Mo. banc 1997). For the reasons stated above, fundamental fairness requires a review of the prosecution's nondisclosure of Braddy's prior convictions. Buck's inability to raise this nondisclosure at any point prior to the Rule 29.15 motion is a rare and exceptional circumstance necessary for Rule 29.15 review of trial error. *Id.* Therefore, we hold that this matter is cognizable in a Rule 29.15 motion.

70 S.W.3d at 446. After deciding Buck's *Brady* claim in his favor, the court then proceeded to reverse and remand for a new trial. *Id.*

Thus, there is ample authority for us to decide Parker's *Brady* claim without a remand. The incident giving rise to Parker's convictions occurred on August 12, 1993, and Parker was arrested a short time later. He was tried and convicted in September 1995 and has been incarcerated for many years. He has professed his innocence from the beginning. Indeed, the record shows that prior to trial, the State offered to dismiss all charges against Parker in return for his testimony against co-defendant Christopher Frasure. In sworn testimony at the beginning of his trial on September 11, 1995, Parker formally rejected the offer, stating that he was doing so "[b]ecause I know I'm innocent," and that he could not accept the offer because he could not truthfully testify that he was guilty of the offense. It was three years after the convictions that this Court issued its mandate, five long

years after that before documents prompting the non-disclosure claim were found, and another three years has now elapsed since that discovery. In light of all this, we should exercise our discretion to decide the case now.

We have before us the complete record, including the extensive transcript of the original trial, as well as the investigative reports that are the subject of the claimed prosecutorial non-disclosure, and four affidavits relating to the non-disclosure issue, as well as several admissions by the State during oral argument. The record before us is sufficient for us to decide Parker's *Brady* claim without a remand, and that record so undermines my confidence in the outcome of his trial, that I would reverse his convictions and remand for a new trial.

## II.

"A *Brady* violation occurs if: (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the state either willfully or inadvertently; and (3) the suppression must have prejudiced the defendant." *State v. Goodwin,* 43 S.W.3d 805, 812 (Mo. banc 2001). "Prejudice in this context is interchangeable with the concept of materiality[.]" 5 Wayne R. Lafave et al., CRIMINAL PROCEDURE § 24.3(b) at 232 (2d ed. Supp.2006).

To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th Amendment] to disclose that evidence to the defendant. Information coming within the scope of this principle ... includes not only evidence that is exculpatory, *i.e.,* going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (internal citations and parentheses omitted).

Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense. The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.[2] Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.

*United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) (internal citations and parentheses omitted); *see also Middleton v. State,* 103 S.W.3d 726, 733 (Mo. banc 2003) ("Prosecutors must disclose, even without a request, exculpatory evidence, including evidence that may be used to impeach a government witness.").

The *Brady* rule, which is in derogation of the ordinary allocation of responsibilities under the adversary system, reflects the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler,* 527 U.S. at 281, 119

---

**2.** "[T]he prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Strickler v. Greene,* 527 U.S. 263, 275 n. 12, 119 S.Ct. 1936, 1945 n. 12, 144 L.Ed.2d 286 (1999) (internal quotation marks omitted). This is because "the individual prosecutor *has a duty to learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) (emphasis added); *Strickler,* 527 U.S. at 281, 119 S.Ct. at 1948.

S.Ct. at 1948. As the United States Supreme Court has explained:

> By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done."

*United States v. Bagley,* 473 U.S. 667, 675 n. 6, 105 S.Ct. 3375, 3380 n. 6, 87 L.Ed.2d 481 (1985) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

The U.S. Supreme Court's "touchstone on materiality," *Banks v. Dretke,* 540 U.S. 668, 698, 124 S.Ct. 1256, 1276, 157 L.Ed.2d 1166 (2004), was set forth in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). That formulation is as follows:

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (internal citations and quotation marks omitted). Consequently, under *Brady,* a constitutional error occurs and the defendant's conviction must be reversed "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381; *see also State v. Jaco,* 156 S.W.3d 775, 781 (Mo. banc 2005) (observing that under the Due Process Clause as interpreted in *Brady,* "the state is required to disclose exculpatory evidence that might be material to the outcome of a case.").

In particular, the United States Supreme Court has recently emphasized that "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Benitez,* 542 U.S. 74, 83 n. 9, 124 S.Ct. 2333, 2340 n. 9, 159 L.Ed.2d 157 (2004). And the Court has previously explained why *Brady* evidence is not subject to the usual standard for "newly discovered evidence":

> [T]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no

special significance to the prosecutor's obligation to serve the cause of justice.

*United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

Therefore, as to materiality, the ultimate issue is not whether Parker would more likely than not have been acquitted if the State had honored its obligation to disclose to Parker all evidence in its possession that was favorable to him and material to his guilt, "but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566; *Goodwin,* 43 S.W.3d at 812. "In making the materiality determination, we view the suppressed evidence's significance in relation to the record as a whole[.]" *Smith v. Sec'y of N.M. Dep't of Corr.,* 50 F.3d 801, 827 (10th Cir.1995); *see also Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402 (noting that in making this determination, the nondisclosure "must be evaluated in the context of the entire record.").

Furthermore, it is essential to keep in mind that the materiality test is "not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles,* 514 U.S. at 434–35, 115 S.Ct. at 1566.

> Indeed, a sufficiency-of-the-evidence test would require appellate courts to usurp the function of the jury, for judges would be forced to guess, based on a cold record, how the jury might have weighed the remaining evidence, standing alone, in a hypothetical error-free trial. Because such an inquiry is inherently unreliable, *Kyles* rightly focuses attention instead on the potential impact the undisclosed evidence might have had on the fairness of the proceedings. Thus, the amount of additional evidence

indicating guilt is not dispositive of our inquiry.

*United States v. Smith,* 77 F.3d 511, 515 (D.C.Cir.1996). Instead, all the defendant must show is that "the evidence [was] material in the sense that its suppression undermines confidence in the outcome of the trial," *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381, because "[a] reasonable probability of a different result is ... shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (internal quotation marks omitted).

Accordingly, in cases involving *Brady* material, unlike the vast majority of direct criminal appeals, it is no answer to say simply that it was up to the jury to determine the credibility of the witnesses it heard testify. What the court must often determine in such cases is whether the nondisclosed evidence had "the potential to alter the jury's assessment of the credibility of a significant prosecution witness," *Avellino,* 136 F.3d at 255, such that the court's confidence in the outcome of the trial is undermined. *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381; *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566. Such evidence is important because "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380. In other words, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]" *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). That is why, in the *Brady* context, the United States Supreme Court has repeatedly stressed that "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others[.]" *Kyles,* 514 U.S. at 445, 115 S.Ct. at 1571 (citing

*Agurs,* 427 U.S. at 112–13 & n. 21, 96 S.Ct. at 2401–02 & n. 21).

Therefore, in adjudicating *Brady* claims, a finding of materiality depends upon "the nature of the charge, the evidence presented by the State, and the role that the nonproduced evidence would likely have played." *State v. Bebee,* 577 S.W.2d 658, 662 (Mo.App. S.D.1979) (internal quotation marks omitted). In other words, as cogently observed by the majority, the court must "ask whether or not the purportedly undisclosed evidence would have been significant to the defendant *in the way that he tried his case." Maj. Op. at 180* (emphasis added).[3]

Furthermore, "[i]n determining materiality of a nondisclosure, account must be taken not only of the precise evidence suppressed but also of such additional evidence to which a skillful counsel would be led by careful investigation." *Lee v. State,* 573 S.W.2d 131, 134 (Mo.App. W.D.1978); *see also Smith,* 50 F.3d at 827 (quoting *Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384) ("We are also to consider 'any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case ... in light of the totality of the circum-stances.' "); *People v. Lumpkins,* 141 Misc.2d 581, 533 N.Y.S.2d 792, 795–96 (N.Y.Sup.Ct.1988) ("[I]t can hardly be doubted that the requirement of due process underlying the *Brady* rule includes disclosure of exculpatory leads[.]"); *Bowen v. Maynard,* 799 F.2d 593, 612 (10th Cir. 1986) (finding *Brady* violation in part because, "in the hands of the defense," the undisclosed evidence "could have been used to uncover other leads and defense theories[.]"). And, as emphasized by the Court in *Kyles,* where multiple items of evidence have been suppressed, the prosecution's *Brady* obligation turns on the cumulative effect of all such evidence suppressed by the government. 514 U.S. at 436 & n. 10, 115 S.Ct. at 1559 & n. 10. Thus, for materiality purposes, courts are obligated to consider the State's non-disclosures "collectively, not item by item." *Kyles,* 514 U.S. at 436, 115 S.Ct. at 1567. Accordingly, "where a number of relatively minor omissions have a cumulative effect, lesser instances of non-disclosure may result in a *Brady* violation." *State v. Leonard,* No. 93 CA 42, 1994 Ohio App. LEXIS 4761, at *5, 1994 WL 583704, at *2 (Ohio Ct.App. Oct. 20, 1994).

In addressing Parker's *Brady* claims, it must be remembered that there was no

---

**3.** In *Smith,* the D.C. Circuit reached a similar conclusion, noting that in *Kyles,* the U.S. Supreme Court "elaborated on the meaning of materiality under *Bagley,* stressing that *a reviewing court must focus on the fairness of the trial the defendant actually received* rather than on whether a different result would have occurred had the undisclosed evidence been revealed." 77 F.3d at 514 (emphasis added). As explained by the Court in *Kyles:*

> This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. *See Agurs,* 427 U.S. at 108, 96 S.Ct. 2392 ("The prudent prosecutor will resolve doubtful questions in favor of disclosure"). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as "the representative ... of a sovereignty ...

whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.

*Kyles,* 514 U.S. at 439–40, 115 S.Ct. at 1568. In other words, *it is for the jury, not the prosecutor,* to decide whether favorable *Brady* information is credible; otherwise "prosecutors might, on a claim that they thought it unreliable, refuse to produce any matter whatever helpful to the defense, thus setting *Brady* at nought." *Lindsey v. King,* 769 F.2d 1034, 1040 (5th Cir.1985).

forensic or other physical evidence of any kind linking him to the shootings and that the State's case against Parker was based solely on eyewitness identification testimony. As such, *any* undisclosed evidence tending to discredit or impeach the eyewitness identification testimony adduced by the State would have "the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Avellino*, 136 F.3d at 255. As discussed by the Eastern District in *State v. Brooks*, 513 S.W.2d 168 (Mo.App. E.D.1973):

> [O]f course, all juries, including the one in this case, are given a credibility of the witnesses' instruction. But for a jury to assess the credibility of a witness, it must be aware of facts which might cause a witness to be less than fully truthful or untruthful. The determination of that credibility is solely within the province of the jury and it is entitled to *any information [possessed by the State] which might bear on that credibility.*

*Id.* at 173 (emphasis added).

### III.

As noted *supra*, "[a] *Brady* violation occurs if: (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the state either willfully or inadvertently; and (3) the suppression must have prejudiced the defendant." *State v. Goodwin*, 43 S.W.3d 805, 812 (Mo. banc 2001). The majority chooses to remand to the trial court to make those findings but as noted, I perceive that to be unnecessary. From the discussion of the investigative reports and affidavits *infra*, it will become apparent that the evidence is favorable to Parker because it is both exculpatory and impeaching, and that its suppression was prejudicial in that it was material. The first question, then, is whether the evidence was suppressed by the State either willfully or inadvertently.

Parker has presented three sworn affidavits from officers of the court to support his claim that the four investigative police reports discussed *infra* were suppressed. The first, dated May 26, 2005, was executed by Parker's trial counsel, Frank Smith III. In this affidavit, Smith states that until the four police reports upon which Parker relies to support his *Brady* claims were shown to him by Parker's current appellate counsel, he "had never seen the documents before."

The second affidavit, dated May 19, 2005, is from James F. Speck, who represented Parker on his Rule 29.15 motion and on appeal from the adverse judgment thereon. In this affidavit, Speck states that during the course of his representation of Parker, he reviewed Smith's file, because part of that representation "included making a determination of whether Mr. Smith had rendered effective representation of Mr. Parker at and before his trial." Speck further states that he saw the police reports in question "for the first time on May 18, 2005, when they were presented to me by Mr. Parker's current appellate counsel. Having reviewed them carefully, even with the considerable passage of time, I can definitively state that these documents were not a part of Frank Smith's file as it was delivered to my office." Speck's affidavit also states:

> Had the documents ... been in the file of Frank Smith III when the file was turned over to me, I am confident that I would have challenged the effectiveness of Mr. Smith as trial counsel in this matter on the basis of his failure to properly investigate the case and obtain the favorable testimony available from these witnesses[.] Because they were not in his file, and because they were not known to anyone representing Mr. Par-

ker until after the 29.15 denial had been affirmed, no such claim was raised. Similarly, had the documents not been in the file and had they become available to me before the filing of the appeal, I would have made a claim in the direct appeal based upon *Brady v. Maryland* that the state had failed to provide material, exculpatory evidence to the defense.

The third and final affidavit, dated June 9, 2005, is from Michael D. Sanders, who has served as the Prosecuting Attorney of Jackson County since 2003. Before that time, says Sanders' affidavit, he was in private practice and had primarily represented criminal defendants in association with Speck. During the course of that practice, he and Speck represented Parker in this court on appeal from the denial of his Rule 29.15 motion. Sanders states that during the course of his representation of Parker, he reviewed the file of Parker's trial counsel (Smith), because part of that representation "included making a determination of whether Mr. Smith had rendered effective representation of Mr. Parker at and before his trial." Sanders' affidavit further states:

> After the Court of Appeals affirmed the decision of the motion court denying Mr. Parker relief on his 29.15 claims, Mr. Parker's family contacted Alvin Brooks and asked him to look into the case. Mr. Brooks contacted me after he obtained certain documents from the Jackson County Prosecuting Attorney. Upon delivery of those documents to our office, both Mr. Speck and I had the chance to compare them to the file I obtained from Frank Smith III. We determined that some of the documents provided to us by Mr. Brooks were not

included in the file we obtained from Mr. Smith.[4]

Finally, Sanders' affidavit avers:

> Had the documents ... been in the file of Frank Smith III when the file was turned over to our office, I am confident that we would have challenged the effectiveness of Mr. Smith as trial counsel in this matter on the basis of his failure to properly investigate the case and obtain the favorable testimony available from these witnesses[.] Because they were not in his file, and because they were not known to anyone representing Mr. Parker until after the 29.15 denial had been affirmed, no such claim was raised.

These affidavits are clearly sufficient to make a *prima facie* showing that the *Brady* evidence at issue in this case was not timely disclosed to the defense at any time before, during, or after trial. Furthermore, during the State's oral argument in this case, the Assistant Attorney General arguing the case, under questioning from this Court, acknowledged that, throughout the entire procedural history of this case, the State has never even so much as hinted that this evidence *was* disclosed to the defense:

Q.: Has the State ever, in any document or anything, affirmatively stated that they provided the information?

A.: No.

\* \* \*

Q.: They did not in the circuit court, [and] they did not here?

A.: No.

\* \* \*

Q.: In the State's response to [Parker's] motion to recall the mandate, the State did not affirmatively declare

---

**4.** Sanders went on to say that the missing documents included the four investigative po-

lice reports upon which Parker relies to support his *Brady* claims.

that it had provided the information, did it?

A.: No.

This, too, strongly suggests that the information was not disclosed. *See generally Bombardier Capital, Inc. v. Richfield Hous. Ctr. Inc.*, Nos. 91–CV–750, 91–CV–502, 1994 U.S. Dist. LEXIS 3432, at *31–32, 1994 WL 118294, at *10 (N.D.N.Y. Mar.21, 1994) (affidavit that did "not affirmatively deny" plaintiff's allegations was insufficient to create a contested issue of fact for summary judgment purposes).

Finally, the record before us makes it crystal clear that the *Brady* evidence in question was never used by either Parker's trial counsel or his counsel in the Rule 29.15 proceedings. As noted by the Tenth Circuit in a similar case, this is powerful evidence that the investigative police reports here were never in their possession:

> [Trial counsel's] testimony was also consistent with a finding of nondisclosure as he testified he never received a copy of that report. But perhaps the most highly probative evidence relating to the disclosure *vel non* of this report is the conspicuous absence of any cross-examination of [an important witness for the State] on the matters contained in [the police officer's] report, matters that were extremely relevant to [the defendant's] defense.

*Smith*, 50 F.3d at 829.[5] The court concluded that "[t]he sum total of this evidence, coupled with the sheer absence of any evidence supporting a finding of disclosure, compels us to conclude the magistrate judge's finding of disclosure of this report was clearly erroneous." *Id.*

The combination of the affidavits, the State's admissions during oral argument, and the fact that neither Parker's trial counsel nor his post-conviction counsel used the evidence are sufficient to establish a willful or inadvertent suppression of the evidence for *Brady* purposes.

## IV.

I next consider, consistent with the legal framework discussed *supra*, a detailed description of the undisclosed evidence presented to this court by Parker. First, there is Detective Borkowski's investigative report, which was prepared on the day after the drive-by shootings occurred. According to the report, at 10:26 p.m. on August 12, 1993, Detective Borkowski responded to 6120 Walrond in regard to an area canvass following a shooting. She interviewed 17–year old Kenneth Wesley at his home at 6114 Walrond. According to Borkowski, Wesley stated that he and his mother, Loretta Wesley, were driving home from Kenneth's workplace earlier that day. Detective Borkowski's report indicates that just as Wesley was about to turn south toward his home on Walrond, he heard numerous gunshots. After completing the turn, he saw a "dark blue, four

---

5. In a footnote, the Tenth Circuit went on to say: "Even if [trial counsel's] testimony is self-serving, thereby weakening this aspect of [the defendant's] *Brady* claim, testimony that [trial counsel] had the report but did not utilize it would be, at the very least, incredible, given his defense at trial, and at most, highly persuasive evidence bearing on [the defendant's] ineffective assistance of trial counsel claim." *Id.* at 829 n. 42. This observation is equally applicable here, because if the State did indeed provide trial counsel with the four investigative police reports underlying Parker's *Brady* claims, his failure to use them would be "at the very least incredible, given [Parker's] defense at trial, and at most, highly persuasive evidence" supporting a claim that trial counsel rendered constitutionally ineffective assistance of counsel. *Id.* Either way, Parker would be entitled to a new trial.

door" vehicle, "possibly a 1988 Cadillac," drive off rapidly.

In his brief, Parker argues, *inter alia,* that the State's suppression of Wesley's identification of the shooter's vehicle during his interview by Detective Borkowski deprived him of a fair trial because Wesley was the only person whose identification did not take place while he was undergoing the traumatizing process of being shot at. Parker is mistaken, because the record shows that the only prosecution witness whose identification of the shooter's vehicle was subject to that particular hindrance to accurate perception was Oscar Bolton, who testified that he attempted to identify the car while the assailant "was shooting directly at" him. Therefore, Wesley was not the only person who had the benefit of being able to try to identify the car while not in the line of fire.

However, Detective Borkowski's report *was* clearly impeaching and favorable to Parker in other important respects, because it directly contradicts the eyewitness trial testimony of Harvey Hamilton and Earl Wells. Hamilton's trial testimony was that the vehicle he saw driving away from the scene of the shootings was definitely "not a Cadillac," but a "light blue" Ford which had a chrome Cadillac front grill and horizontally-oriented rear brake lights, reverse lights, and parking lights characteristic of a Ford. Wells testified that he saw Parker driving a "light blue" vehicle he recognized as Christopher Frasure's Ford Granada.

In contrast, Detective Borkowski's investigative report of her interview with Wesley indicates that the shooter's vehicle was not "light blue" but "dark blue," and was not a Ford Granada but possibly a 1988 Cadillac. Therefore, Detective Bor-

kowski's undisclosed report clearly called into question the accounts of Hamilton and Wells as to the make, model, *and* color of the car from which the shots were fired.

Furthermore, Hamilton's eyewitness testimony regarding the make, model, and color of the car from which the shots were fired was somewhat shaky to begin with, because on cross-examination, Hamilton conceded that when being interviewed by Detective Borkowski at the emergency room on the morning of August 13, 1993, he told her that he did not see where the shots had come from because he was on the ground next to another car and "had his eyes closed at the time" while engaged in prayer. Hamilton also acknowledged on cross-examination that he had told Detective Wilson on the night of the shootings that the shooter's car "appeared to be white." Since Wesley's impeaching statements as reported by Detective Borkowski were suppressed, the jury was deprived of the opportunity to evaluate those statements, which would have called Hamilton's testimony into further question.

This is also true of Wells' testimony, but even more so. As this court observed in its original opinion dismissing Parker's direct appeal of his convictions and affirming the denial of Parker's Rule 29.15 motion, Wells was critically important to the State since he "was *the only witness* to have given a positive identification of Tyrone Parker as the driver of the co-defendant Frasure's automobile[.]" *State v. Parker,* 972 S.W.2d 508, 510 (Mo.App. W.D.1998) (emphasis added).[6] But when the police asked Wells just four hours after the shootings if he could recognize anyone in the car, Wells was unable to identify the driver, stating only that he could see that

---

6. The transcript confirms that neither Hamilton nor Bolton saw Parker at or near the time of the shootings.

it was either Frasure or Parker. *Id.* What's what's more, Parker's trial counsel did not cross-examine Wells "about this inability to identify the driver of the car some four hours after the incident[.]" *Id.* at 511.

The State knew of Wesley's existence as an eyewitness to the shootings who, as reported by Detective Borkowski, saw something entirely different from that of the State's other eyewitnesses, including Hamilton and Wells. Given that the State's case against Parker was based entirely on eyewitness identification testimony, it was most certainly a violation of due process to deprive the defense of this information. Confidence in the jury's verdict is substantially undermined because Wesley's statement to Detective Borkowski would have cast doubt on all of Wells' eyewitness testimony at trial, including that which identified Parker as the driver of the assailant's car. As the Second Circuit put it while reversing the denial of habeas relief in a case involving somewhat similar facts:

> [Appellant's] *Brady* argument cites eyewitness testimony in a murder case in which there was no evidence of [Appellant's] guilt other than eyewitness identification. The evidence at issue was therefore of a kind that would suggest to any prosecutor that the defense would want to know about it.[7] More particularly, [the nondisclosed] testimony casts doubt on the testimony of both eyewit-

nesses presented by the prosecution at trial.

*Leka v. Portuondo,* 257 F.3d 89, 99 (2d Cir.2001). The need for such impeachment evidence was even more imperative here, since the transcript shows that during his closing argument, the prosecutor maintained that the State's witnesses were especially credible since "they were not scratched on cross-examination by anything that they testified to. Not a lick." Later, the prosecutor stressed: "Earl [Wells] and Oscar [Bolton] and Harvey Hamilton were unscratched in their testimony. It is all there. And I ask you to do the right thing. Come back with guilty, and slap him [Parker] real hard for this."[8]

## V.

The next item for consideration is Wesley's sworn affidavit of May 18, 2005. According to Wesley's affidavit, when he "turned south onto Walrond from 61st St., he saw a large, dark-colored car driving very slowly up ahead." When that car "came even with the Bolton home at 6120 Walrond," Wesley saw "flashes and gun shots coming out of the car and into the Bolton home." Wesley's affidavit further states that the vehicle he saw "driving slowly ahead of [him], firing the shots, and then speeding up was much bigger than a Ford Granada, especially in width." After indicating that he was shown photographs of the Ford Granada which had been described by Hamilton and Wells as the as-

---

**7.** Missouri courts have employed similar language to describe material evidence found to have been illegally suppressed by the State. *See State v. White,* 81 S.W.3d 561, 571 (Mo. App. W.D.2002) (referring to such evidence as being " 'of a kind which any capable trial lawyer would like to have.' ").

**8.** Indeed, the U.S. Supreme Court has indicated that a useful measure of the importance of a given witness or witnesses and the materiality of *Brady* evidence affecting their credibility is the amount of emphasis the prosecu-

tor placed on the witness' testimony at trial. "The likely damage [from a *Brady* nondisclosure] is best understood by taking the word of the prosecutor" during closing arguments. *Kyles,* 514 U.S. at 444, 115 S.Ct. at 1571. *See also Smith,* 77 F.3d at 515 (observing that in determining the materiality of nondisclosed evidence under *Brady,* the reviewing court "must look ... to the ways in which the witness' testimony was allowed to stand unchallenged.")

sailant's vehicle, Wesley's affidavit avers that the "Granada is not the vehicle I saw with the shots coming out of it," and states that vehicle from which the shots were fired "was also much darker than the Granada in the photos." "After the shooting stopped," says Wesley's affidavit, the assailant's car "sped off southbound on Walrond and ran the stop sign at 62nd and Walrond." Wesley "did not see anyone standing at that intersection when the car sped through the intersection," and "did not see anyone jump in their car and speed off after the people in the vehicle that did the shooting."

Wesley's affidavit must be considered because it constitutes "additional evidence to which a skillful counsel would have been led by careful investigation" had the investigative report been disclosed prior to trial. *Lee,* 573 S.W.2d at 134. Given the substantial impeachment value of the report, discussed in detail *supra,* it flies in the face of reason and experience to argue, as does the State in its brief, that "[n]o reasonable defense attorney would have pursued Wesley as a witness based on the information contained in the police report." Furthermore, the fact Wesley's affidavit was obtained by Parker's current appellate counsel once counsel became aware of the report's existence also strongly militates against accepting the State's argument, because it shows that counsel quickly recognized the report's significance and promptly followed up on that promising lead.

The State also argues that Parker and his trial counsel were adequately alerted to the existence of an undisclosed interview of Wesley by the police since the prosecuting attorney listed him as a witness on the charging document.[9] However-

er, "the notion that defendants must scavenge for hints of undisclosed *Brady* material" is wrong. *Banks,* 540 U.S. at 695, 124 S.Ct. at 1275. As indicated by the extensive case law discussed *supra,* the State's suggestion that its endorsement of a witness can be a valid substitute for a proper and timely *Brady* disclosure is, quite simply, incorrect, as "[i]t is not enough for the prosecution to avoid active suppression of favorable evidence; *Brady* and its progeny *require disclosure." Leka,* 257 F.3d at 103 (emphasis added). As the United States Supreme Court made clear in *Banks,* any rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." 540 U.S. at 696, 124 S.Ct. at 1275.

It is likewise noted that the State repeatedly references the fact that Wesley's affidavit was executed "more than ten years after the incident in question." But Wesley's affidavit makes it clear that although he "was not called to testify at anyone's trial regarding this matter," he "would have been happy to discuss the incident with anyone connected with the case if they had asked, even though my mother did not particularly want me to get involved." To suggest, as the State does, that Parker should be penalized for the *State's* failure to timely honor its legal disclosure obligations by having Wesley's affidavit entirely disregarded due to its more recent vintage is repugnant to the concept of fundamental fairness. The only reason for the ten-year delay was the State's failure to disclose impeachment evidence *it had a legal duty to provide to the defense prior to or during trial in the first place.* Thus, Parker cannot be faulted for

9. It is true that Wesley is listed as a potential witness on the charging document. It is also true that the State listed the names of forty-

four other potential witnesses on the charging document, most of whom (like Wesley himself) were not called by the State at trial.

failing to raise and fully investigate the State's nondisclosure of *Brady* evidence that he did not know about until some ten years had passed. *See Buck,* 70 S.W.3d at 445–46.

The State further points to what it describes as "inconsistencies" between Wesley's affidavit and Detective Borkowski's investigative report. While it is true that the former goes into much more detail than the latter [10] and that some of that additional detail is not consistent with the report, it is hardly surprising that there are differences between the two. One was executed under oath by Wesley himself in his own words, while the other was prepared by a police officer who was conducting a neighborhood canvass of many different residents and used her notes to summarize what she had heard Wesley say during the interview. One was executed without time constraints; the other was the account of an interview conducted late in the evening by a police officer with multiple investigative duties and limited time to perform them. Moreover, as noted *supra,* the State's case against Parker prominently featured the testimony of several witnesses who gave accounts at trial which were inconsistent with their statements to the police on the night of the shootings. Since it was within the sole province of the jury to decide what weight to give those witnesses' trial testimony in Parker's first trial, it would also be for the jury to assess Wesley's credibility in any new trial. Finally, for purposes of materiality under *Brady,* what is important is that the vehicle he saw speed away immediately after the shots were fired and run the stop sign at 62nd and Walrond was *not*

Frasure's light blue Ford Granada, but a dark blue car (possibly a 1988 Cadillac) that was much darker, bigger, and wider than the Granada.

The bottom line is that in his affidavit, Wesley's description of the vehicle from which the shots were fired was that it was a large, dark-colored car that was much bigger and wider than a Ford Granada. He also said that the Ford Granada described by Hamilton and Wells as the assailant's vehicle was *not* the vehicle Wesley saw from which the shots were being fired and that the vehicle he saw was also much darker than that Granada. Furthermore, the affidavit indicates that Wells (who, as noted *supra,* was *the only witness* at trial to have given a positive identification of Parker as the driver of the shooter's vehicle) was *not* standing at the corner of Walrond and 62nd Street immediately after the shootings, and that, in stark contrast to what Bolton and Wells testified at trial, no one jumped into a car and sped off after the assailants immediately after the shootings. This evidence is plainly material in every sense of the word because, if believed by the jury, it would *completely exonerate* Parker. Under these circumstances, to conclude that in the absence of this evidence Parker "received a fair trial, understood as a trial resulting in a verdict worthy of confidence," *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566, the other evidence against Parker would have to have been absolutely overwhelming—which it was not.[11] In this regard, the United States Supreme Court has provided the following illustration:

---

10. Such is the nature of investigation when it is conducted by parties with different roles. A skilled defense attorney re-interviewing Wesley with the officer's report in hand will necessarily go further and deeper than the officer did.

11. While the State presented sufficient evidence of Parker's guilt from which a reasonable juror could have found him guilty beyond a reasonable doubt, it can hardly be said that the evidence against him was overwhelming, and the State does not claim otherwise.

If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse, the result might well be different.

*Agurs*, 427 U.S. at 112 n. 21, 96 S.Ct. at 2402 n. 21 (quoting Comment, *Brady v. Maryland and The Prosecutor's Duty to Disclose*, 40 U. CHI. L.REV. 112, 125 (1972)).

### VI.

The evidence from Wesley was not the only exculpatory evidence the State had in its possession but did not disclose to the defense. Once again, a careful review is essential to the materiality analysis.

At 10:26 p.m. on August 12, 1993, Detective Borkowski responded to 6120 Walrond in regard to a shooting. According to this investigative report, which was dated the following day (August 13, 1993), Detective Borkowski interviewed 68–year–old Gearlene Williams at that address, who stated that she "was in her bedroom about to go to sleep when she heard numerous shots fired." Williams knew the shots were close, so she dropped to the floor on her stomach and crawled into the living room of the house. At this time, "Janice Arnold, and several other people came inside saying they were shot." Also at this time, Williams "saw Fonda [Lewis] and her friend Freda [Alfrieda Hider] in the family room."

On that same night, Detective Borkowski also interviewed another person who was in the house at the time of the shooting—16–year–old Fonda Lewis, who was Gearlene Williams' granddaughter and Janice Arnold's daughter. Lewis lived at 6120 Walrond and was in the front living room watching television with her friend, 17–year–old Alfrieda Hider. Lewis told Detective Borkowski that at about 10:15 p.m., she was about to look outside to check on her three-year-old son, Kion Bowman, and noticed that Janice Arnold, Oscar Bolton, Harvey Hamilton, and the murder victim (Gregory Bolton, Jr.) were outside "praying like they occasionally do." Lewis then "suddenly heard numerous shots outside the house," after which "all the above people came inside" the house.

On August 13, 1993, at 10:20 a.m., Detective Pruetting and Detective Barrios of the Kansas City, Missouri, Police Department went to 7224 Wayne in Kansas City to interview Alfrieda Hider at her home. Hider told the officers that, at around 10:15 p.m. the previous night, she was sitting on a couch at 6120 Walrond watching television with Fonda Lewis when she heard several gunshots outside and dove to the floor. Hider further stated that "Janice [Arnold], Harvey [Hamilton], Oscar [Bolton], and two kids were standing out in front of the residence" when the shots were fired. She heard screaming outside the residence after the shots were fired, and "Janice then walked inside the residence holding [Gregory Bolton, Jr.], saying they had been shot." Hider further stated that "Oscar and Harvey also came inside and said they had been shot."

At trial, Parker did not deny that he and Frasure traveled in a vehicle southbound on Walrond in the area of the home at 6120 Walrond after 10:00 p.m. on August 12, 1993. However, Parker denied that either he or Frasure shot at anyone out-

side the house at 6120 Walrond, explaining that when they passed 6120 Walrond, "[t]he house was black. Everything was dark. . . . . No lights, no activity, no nothing."

Therefore, the undisclosed statements made by Williams, Lewis, and Hider during their interviews by the police could have played an important role in Parker's defense inasmuch as they could have been used to establish that all three women were inside the house at 6120 Walrond at the time of the shootings, and that everyone who was standing outside in front of the residence (including *all those who had been shot,* such as Arnold, Hamilton, and Bolton) came inside immediately after the shots were fired. This would have substantially bolstered Parker's alibi defense, which was that he observed a dark, quiet yard and house when he drove by 6120 Walrond sometime between 10:15 p.m. and 10:30 p.m. on August 12, 1993.[12]

As illustrated by the transcript and argued by Parker, the State was well aware what Parker was going to say about the lack of activity in front of 6120 Walrond when he and Frasure drove by. During her opening statement, the prosecutor began preparing the jury to accept the proposition that from the moment of the shooting, the area outside of 6120 Walrond was a scene of chaos and confusion. The prosecution described the scene as one of "pandemonium" and "absolute chaos," saying that the evidence would show that "[p]eople were running around screaming in the front yard and on the porch" of Bolton's

home and that Janice Arnold ran around the yard carrying her wounded 11–month–old grandson Gregory Bolton, Jr. in her arms after they had both been shot and then ran back into the yard after giving him to his great-grandmother. At this time, the prosecutor also stated: "And you know what he [Parker] says the place is like? He says no light on in the house. There is no pandemonium, according to this defendant. No chaos in the street."

Similarly, long before Parker took the stand in his own defense, the prosecution called witnesses (including police officers Brian Price and Brent Thompson) who testified that the scene they observed upon their arrival was "chaotic" and "very hectic." And in the opening portion of his closing argument, the prosecutor denigrated Parker's claim that he was able to travel past 6120 Walrond without seeing the chaos the State's witnesses had described, referring to it as "a flat out-and-out lie." The prosecutor also argued:

> And they say the house is dark. . . . [I]t is impossible for them to have driven down Walrond and not seen those people in their pain and misery out in front of that house. . . . By any time frame it is impossible for him [Parker] to have driven down there and seen the house dark. . . . [T]he facts prove that he is lying. The facts prove it.

Later, in the rebuttal portion of his closing, the prosecutor got even more specific, arguing that Parker's alibi defense was unworthy of belief since he was the only

---

**12.** Although "[t]he term 'alibi' in common parlance frequently seems to anticipate the presentation of testimony by witnesses other than the accused," *State v. Anderson,* 18 S.W.3d 11, 16 (Mo.App. W.D.2000), none of the three women was a "true alibi witness at all because, even if believed, [their] testimony does not show that [Parker] was not present at the scene of the crime" when it was com-

mitted. *State v. Evans,* 896 S.W.2d 56, 62 (Mo.App. W.D.1995). However, their testimony does corroborate the testimony of Parker, who clearly was such a witness. *See Anderson,* 18 S.W.3d at 16 (emphasis added) (noting that an alibi may rely for its weight "on the credibility of other persons, *or on circumstantial evidence.*").

witness at trial whose account was consistent with that theory:

> And what did [Officer Thompson] tell you he saw at the scene when he got there? He was dispatched at 10:26. He estimated his arrival at 10:30 at the latest is what he told you. And he said it was so chaotic. There were people running around and screaming and yelling.... And incredibly enough, this defendant wants you to believe he drove right past there at right about that time and saw nothing. Incredible. That's the defendant's statement.

The prosecuting attorneys would not have been able to make any of the forceful arguments recounted *supra* had the State disclosed to the defense the statements of Gearlene Williams, Fonda Lewis, and Alfreida Hider to the police. This is because according to those statements, it *was* possible for there to have been a time, shortly after the shootings, when the area outside 6120 Walrond was dark and quiet, but before the police arrived to find "chaos," during which Parker and Frasure drove by the Bolton home. For example, Lewis and Hider stated that the shots were fired at approximately 10:15 p.m. If the shots were fired at 10:15 and the police arrived at 10:30, there was a window of fifteen minutes for Frasure's car to drive by 6120 Walrond before the police arrived to find "chaos." Thus, their statements could have been used by the defense to establish that there was a "lull" shortly after the shootings—a time when the yard outside the home was empty, dark, and quiet, but before the police arrived to a scene of pandemonium. Likewise, the statements of the three women also would have provided the defense with three witnesses who could have pinpointed both the time of the shootings and the actions of the injured parties immediately afterward (something none of the witnesses called by the State at trial did). In either case, they

tend to independently corroborate Parker's story that when he drove past 6120 Walrond, he found only a quiet street. Furthermore, in its brief, the State concedes the importance, to Parker's defense, of having witnesses other than just Parker himself to support his theory of the case.

From the foregoing, it is readily apparent that the statements in question were exculpatory in that they could have been used to rebut the prosecution's claims that, "[b]y any time frame," it was "impossible" for Parker and Frasure "to have driven down Walrond and not seen those people in their pain and misery out in front of that house" and that Parker's trial testimony to the contrary was "a flat out-and-out lie." They could also have been used to preempt the prosecutor's argument that Parker's alibi defense was utterly unworthy of belief since he was the only witness at trial whose account was consistent with that theory. Furthermore, Wesley's affidavit also bears directly and favorably on Parker's alibi defense inasmuch as it states: "After the shooting, the police did not show up for a few minutes. It was strange because there was no one outside the house and it was very quiet until the police arrived." This further corroborates Parker's alibi, and provides yet another important observation about a time before the police witnesses arrived to find chaos but after the shootings had occurred—a time when Wesley saw a dark, quiet street and a time when Parker could also have seen a dark, quiet street outside 6120 Walrond as he drove by.

Therefore, the transcript of the arguments actually made by the State in both its opening and closing statements makes abundantly clear the important role the suppressed evidence would likely have played in bolstering Parker's alibi at trial.

Accordingly, one can hardly be confident that Parker received a fair trial given "the way that he tried his case," *Maj. Op. at 3,* in light of the jury's ignorance of the existence of three witnesses other than Parker who would have corroborated his alibi and precluded the State from arguing, as it did throughout the trial, that Parker's alibi testimony was "a flat out-and-out lie" since it was "impossible" for that alibi to be true "[b]y any time frame."

## VII.

As noted *supra,* where multiple items of evidence have been suppressed, the prosecution's *Brady* obligation turns on the cumulative effect of all such evidence suppressed by the government. *Kyles,* 514 U.S. at 436 & n. 10, 115 S.Ct. at 1559 & n. 10. For purposes of materiality, the evidence must be viewed "collectively, not item by item." *Kyles,* 514 U.S. at 436, 115 S.Ct. at 1567. From the foregoing review and analysis of that evidence, it is quite clear that collectively, Detective Borkowski's investigative report of her interview with Wesley, Wesley's subsequent affidavit, and Detective Borkowski's investigative reports of her interviews with Williams, Lewis, and Hider constitute significant evidence that could have been used by a skilled defense attorney to cast serious doubt as to Parker's guilt. *Cf. White,* 81 S.W.3d at 570 (holding that the nondisclosed *Brady* "information was of sufficient import that the lack of disclosure deprived [the defendant] of a fair trial and undermined confidence in the verdict" even though "some of the allegations seemed implausible and the corroboration of [a witness's] testimony was very limited.").

## VIII.

"The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3379–80. "The prosecutor's obligation to disclose material information to the defense is a fundamental component of the guarantee that criminal defendants receive fair trials." *Smith,* 77 F.3d at 517. For these reasons, because Parker's allegations and supporting written affidavits are sufficient to state actionable *Brady* claims, and consistent with the Supreme Court's procedure in *Patterson* and *Hayes,* as well as the Eastern District's decision in *Buck,* I would reverse Parker's convictions outright and remand the case to the trial court for a new trial.