STATE of Missouri, Respondent,

v.

Theodore W. WHITE, Appellant.

No. WD 58462.

Missouri Court of Appeals,
Western District.

Submitted Nov. 14, 2001.

Decided April 30, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

Application for Transfer Denied Aug. 27, 2002.

Sean D. O'Brien, Jeremy Weis, Ellen Y. Suni, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for Respondent.

Before JAMES M. SMART, JR., P.J.; HAROLD L. LOWENSTEIN, and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Appellant Theodore W. White, Jr., was convicted by a Jackson County jury on twelve counts relating to the sexual molestation of his adoptive daughter Jami White. Jami was twelve years of age at the time she made the accusations of abuse. Mr. White was convicted of two counts of rape, three counts of child molestation in the first degree, two counts of child molestation in the second degree, four counts of statutory sodomy, and one count of furnishing pornographic material to a minor. Mr. White was sentenced to a period of fifty years for Counts I and XII; seven years for Counts II, V and VII; twenty-five years for Counts III, IV, VI and XI; one year for Counts VIII, IX and X. The court ordered each of the sentences to run concurrently.

Appellant raises six points on appeal. The first three points relate to rulings stemming from the use by Dr. Sherman, Jami White's counselor, of "traumatic incident reduction" techniques to help Jami to remember incidents of abuse, and to discovery rulings related to Dr. Sherman's techniques. Mr. White's fourth point on appeal relates to alleged prosecutorial misconduct that occurred when the State failed to disclose to Mr. White's attorneys the fact that the chief investigator of the alleged crimes was engaged in a romantic relationship with Mr. White's wife. The final two points involve evidentiary rulings related to a letter written by Jami White to her high school counselor and a prior false allegation of abuse. In addition to responding to appellant's points on appeal, the State also files a motion to dismiss based upon the escape rule, which was taken with the case. For the reasons that follow, we deny the State's motion, reverse the conviction, and remand for a new trial.

## Statement of Facts

The allegations of child sexual abuse in this matter arose while a dissolution of marriage action was pending between Tina White and Ted White. Mrs. White had two children from a previous marriage, Jami White, born June 18, 1985, and Danny White. Mr. White adopted these children. A third child, Tanner, was born to the marriage in 1996.

Mr. White was an entrepreneur who raised capital for start-up corporations.

In August of 1997, there was friction in the marriage. The Whites were discussing divorce, and there was a brief separation in the fall of 1997. Mr. White moved out of the house, and Mrs. White filed for a divorce. After reaching an agreement that one of Mr. White's corporate officers would pay Mrs. White a monthly allowance, Mr. White moved back into the house. The petition for dissolution of marriage, however, was not dismissed.

On March 21, 1998, Mr. White and Jami's brother, Danny, went to a Boy Scout camp for the weekend. Jami, after playing basketball, came into the house and told her mother, "Dad's been touching me." Jami and her mother then talked for approximately two hours. Jami related specific instances of abuse while Mrs. White took notes and asked Jami about what had happened to her. Tina White then called the Lee's Summit police. The first officer to respond to the call was Officer Richard Bledsoe. The officer first discussed the allegations with Mrs. White and then questioned Jami about the alleged occurrences. Jami's paternal grandmother arrived as Officer Bledsoe was finishing his interview. Jami subsequently told her grandmother about one incident and her mother about another.

The following day, Mr. White and Danny arrived home from the camping trip. Mrs. White confronted Mr. White with the allegations. He denied the allegations.

Two days after Jami first made the allegations of abuse, she first met with counselor Richard Sherman. Dr. Sherman is a licensed professional counselor. Dr. Sherman conducted numerous sessions with Jami. In those sessions, he used what he described as a "traumatic incident reduction technique" in which "deep muscle relaxation" was used to place Jami in a "desensitized, relaxed state." Sherman then questioned Jami about the allegations of abuse, having her repeat each scenario four to six times, so he could, in his words "reframe" her memories of abuse. According to evidence presented at trial by Mr. White in an offer of proof, the technique Sherman used is similar in effect to hypnosis. It is undisputed that Jami "discovered" at least two new and additional incidents of abuse as a result of her sessions with Dr. Sherman.

Subsequent to the first visit with Dr. Sherman, Detective Richard McKinley was assigned to this case. Detective McKinley was responsible for investigating most of the sexual abuse cases in Lee's Summit. During his investigation, McKinley reviewed Jami's diary. Finding there was no evidence contained in the diary which would incriminate Mr. White, he returned the diary to Jami rather than retaining it. The diary subsequently was missing or lost, and was unavailable at the time of trial.

By the time the investigation finished, Jami had made at least fourteen allegations of abuse covering a time span of June 1995 until March 1998. Detective McKinley executed the necessary probable cause statement, and the State filed charges against Mr. White in April of 1998.

At trial, Jami White described various incidents of abuse. Her mother offered minor corroboration, mentioning one time she encountered White and Jami in the master bedroom. Jami was fully clothed, but White was running toward the bathroom with his shorts not entirely up. He explained that he had a sudden attack of diarrhea, an explanation which Mrs. White said she accepted at the time. On another occasion, White got up from watching TV in the family room with Jami. The two had been sharing a blanket. Mrs. White said she noticed that Mr. White appeared to be sexually aroused. Although not strongly corroborative, Mrs. White's testimony as

to these incidents was consistent with specific incidents which Jami described.

After the jury returned its verdict, but before the sentencing hearing was held and the motion for new trial was due, one of Mr. White's attorneys received a telephone call from one of Mrs. White's co-workers informing him that Mrs. White was romantically involved with Detective McKinley, and had been for some time. Armed with this information, counsel called the prosecutor's office. In a conversation on March 11, 1999, counsel for the State admitted knowledge that Mrs. White and Detective McKinley had been involved in a relationship for "nearly a year." The State's attorney also indicated that its office had been aware of the relationship almost as soon as it had begun. When asked why such information about the relationship had not been disclosed, the State's attorney indicated that a meeting had been held in the prosecutor's office, and a decision was made that the information was not relevant or material to the case. Mr. White's attorneys filed a motion for new trial, including a claim of prosecutorial misconduct, and a motion to disqualify the Jackson County prosecutor's office from proceeding further. The motions were denied.

Prior to the sentencing hearing, Mr. White fled to Costa Rica. As a result, sentencing was delayed for approximately eleven months. Law enforcement agencies undertook a nationwide manhunt. Once Mr. White was located, the State transported Mr. White from Costa Rica after Mr. White waived an extradition hearing. After Mr. White was returned to the state, the trial court entered its sentence and this appeal followed.

### Escape Rule

As a preliminary matter we take up the State's motion to dismiss, which is based upon the "escape rule." The State argues that White's appeal should be dismissed because he fled the United States after the jury returned its verdict but before the date set for sentencing. The State argues that it was forced to incur costs in finding and extraditing White back to Missouri for sentencing. By fleeing the country, the State argues, White showed contempt for the authority of the court and failed to abide by its rules and decisions even though now he seeks the protection of the that same judicial system. In other words, if White's escape is overlooked, the State argues, the criminal justice system suffers. Juxtaposed against the State's claim of harm to the criminal justice system, White reminds us, is the harm to the criminal justice system if the prosecutorial misconduct is allowed to stand. Thus, White argues, this court should exercise its discretion and hear the appeal. We agree.

■ "The escape rule operates to deny the right of appeal to a defendant who escapes justice." *State v. Troupe*, 891 S.W.2d 808, 809 (Mo. banc 1995). This judicially created doctrine first appeared in Missouri in the case of *State v. Carter*, 11 S.W. 979, 98 Mo. 431 (1889), when the defendant escaped while his appeal was pending. "The rationale expressed for the application of the escape rule was the need for a court to have control over the defendant before rendering its decision on appeal." *Troupe*, 891 S.W.2d at 810. "Otherwise, the defendant 'places himself in a position to speculate on the chances of reversal, meanwhile keeping out of the reach of justice, and prepared to render the judgment of reversal nugatory or not, at his option.'" *Id. (quoting Carter*, 11 S.W. at 980).

■ In the hundred plus years following *Carter*, the courts have subsequently advanced other justifications for the escape rule. For example: lessening administra-

tive difficulties caused by the defendant's long absence, *State v. Kearns,* 743 S.W.2d 553, 554 (Mo.App.1987); reducing prejudice to the State in the event of a remand for new trial, *id.;* discouraging escape and encouraging voluntary surrender, *id.* at 555; and disallowing a defendant to selectively abide by the decisions of the courts. *State v. Wright,* 763 S.W.2d 167, 169 (Mo. App.1988). In *Troupe,* the Missouri Supreme Court examined the effect of *Ortega–Rodriguez v. United States,* 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993), on Missouri's application of the escape rule.

■ The defendant in *Troupe,* as in this case, fled after the return of the jury verdict but before sentencing. *Troupe,* 891 S.W.2d at 809. Troupe argued that the appellate courts should not automatically apply the escape rule when the escape occurred prior to sentencing and has no impact on the appellate process, citing *Ortega–Rodriguez.*[1] *Id.* The Court noted that *Ortega–Rodriguez* was decided by the United States Supreme Court as an exercise of its supervisory power over the federal courts and not on the basis of any constitutional principle. *Id.* at 810. Citing the various justifications for the escape rule, along with the reasoning of *Ortega–Rodriguez,* the Court decided not to depart from Missouri precedent. *Id.* In making its decision, the Court stated:

A reviewing court may invoke procedural rules to protect the orderly and efficient use of its resources. In applying the escape rule, the relevant inquiry is whether the escape adversely affects the criminal justice system. If so, dis-

missing the escapee's appeal is appropriate. This determination is left to the sound discretion of the appellate tribunal.

*Id.* at 811. Since *Troupe* was decided, this court has exercised its discretion to apply the escape rule to dismiss appeals. *See, e.g., State v. Surritte,* 35 S.W.3d 873 (Mo. App.2001); *State v. Burk,* 49 S.W.3d 207 (Mo.App.2001). The court has also declined to apply the rule, allowing an appeal to proceed. *State v. Collins,* 42 S.W.3d 736 (Mo.App.2001).

■ The State argues that White's escape adversely affects the criminal justice system. Indeed, a delay of eleven months has an adverse impact on the criminal justice system. *See Troupe,* 891 S.W.2d at 811 (stating that a delay of eight months has an adverse impact on system). However, it should also be considered that White learned after the verdict that Tina White and the chief investigator of the alleged crime had been engaged in a romantic relationship. White also learned that the prosecution knew about the relationship for approximately one year but failed to disclose the information to the defense. Although we condemn White's actions in fleeing, our concerns about the issues of this case move us to exercise our discretion to deny application of the escape rule. Accordingly, we deny the motion to dismiss.

### Due Process Allegation

Because some of the points on appeal raise matters that may not have been properly preserved, and because of the

---

1. In *Ortega–Rodriguez,* the United States Supreme Court held that "in general, a court of appeals may not dismiss an appeal pursuant to the federal fugitive from justice rule unless the escape coincides with the pendency of the appeal or it adversely affects the appellate process. The Supreme Court stated that re-

capture prior to the commencement of appellate proceedings usually severs the connection between the escape and the appellate process." *Troupe,* 891 S.W.2d at 809 (citations omitted) (*citing Ortega–Rodriguez,* 113 S.Ct. at 1205–06, 1209).

significance of White's fourth point on appeal, we turn directly to that point. In his fourth point, he argues that the trial court erred in denying his motion for new trial and amended motion for new trial, because the prosecutor withheld exculpatory evidence and intentionally misled the jury by deliberately concealing a romantic relationship between Tina White and Detective McKinley. White argues that the State, after concealing this information, argued to the jury that it was absurd to believe that Tina White had either given or promoted false testimony about the allegations of sexual abuse. White points out that the assistant prosecuting attorney sat by silently during McKinley's deposition when McKinley testified that he had no interest in the outcome of the case, even though it was known to the prosecutor that McKinley was engaged in a romantic and intimate relationship with Mrs. White, who stood to benefit financially from evidence of Ted White's marital misconduct in a divorce. White alleges that under the circumstances of this case, the failure to disclose the relationship violated his constitutional rights as expressed by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In response, the State argues that the relationship of Mrs. White and Detective McKinley was not material to the case because it began only after the assertion of the claims of sexual abuse. The State also argues that the affidavits attached to the motion for new trial were not self-proving, and in any event there was other evidence to impeach Mrs. White as it related to her financial motives and her desire to gain a favorable outcome in the divorce. Further, the State argues the information could not be used to impeach McKinley because he was not called as a State witness, but rather was called by White as a witness. Thus, the State contends, the

trial court did not err in denying the motion for new trial.

Our review of the trial court's denial of a motion for new trial is for an abuse of discretion. *State v. Aaron*, 985 S.W.2d 434, 436 (Mo.App.1999). " 'Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. ....' " *State v. Jackson*, 969 S.W.2d 773, 775 (Mo.App. 1998) (*quoting King v. Copp Trucking, Inc.*, 853 S.W.2d 304, 307 (Mo.App.1993)). Rulings made within the trial court's discretion are presumed correct, and as a consequence, the appellant has the burden of showing that the trial court abused its discretion. *State v. Albanese*, 9 S.W.3d 39, 45 (Mo.App.1999). Here, the trial court denied the motion for new trial without conducting an evidentiary hearing. Because of that fact, and because the State does not deny the existence of the relationship between Tina White and Detective McKinley, we will assume the facts asserted in the motion for new trial to be substantially true. Because the affidavits asserted factual matters but did not provide extensive detail, the real issue before us is whether it was an abuse of discretion to summarily deny the motion for new trial.

"The *Brady* rule is based on the requirement of due process." *Id.* at 46 (*quoting United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "[W]hen the State suppresses evidence which may be favorable to a defendant, it violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good or bad faith of the State." *Aaron*, 985 S.W.2d at 436. A constitutional error occurs if the suppression deprives the defendant of a fair trial. *Albanese*, 9 S.W.3d at

46. Thus, "[t]he issue is not whether the defendant would more likely than not have received a different verdict with the disputed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *State v. Goodwin,* 43 S.W.3d 805, 812 (Mo. banc 2001) (*citing Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Consequently, a constitutional error occurs under the *Brady* rule, and, therefore, requires a reversal of the defendant's conviction and a new trial, "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Albanese,* 9 S.W.3d at 46 (*quoting Bagley,* 473 U.S. at 677–78, 105 S.Ct. 3375.)

■ "A *Brady* violation occurs if: (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the state either willfully or inadvertently; and (3) the suppression must have prejudiced the defendant." *Goodwin,* 43 S.W.3d at 812 (*citing Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The evidence here was, White argues, impeaching of Tina White, who testified as a witness and provided a measure of corroboration to Jami's testimony. The evidence was suppressed, as acknowledged by the State. The disagreement is about whether the information was material and whether suppression of the information was prejudicial to white in the sense that it denied him a fair trial and undermines confidence in the verdict.

■ White points out that, in failing to correct McKinley's testimony during his deposition when he stated that he had no personal interest in the outcome of the case, the State violated its duty to White. We agree. *See Hutchison v. State,* 59 S.W.3d 494, 496 (Mo. banc 2001). Because of the State's failure to correct the testimony of McKinley, and because it continued to withhold information as to the relationship, White argues that he lost the opportunity to explore the development of a more effective defense based upon the notion that Tina White not only cared about the outcome of the prosecution in the way that any mother would, but that she also was willing to take matters into her own hands to help secure the conviction. If Tina White was willing to initiate a relationship with the primary detective in order to gain influence with prosecution, she might also be willing to shade the truth in order to corroborate Jami's claims. Thus, White argues, this fact tends to impeach Tina White's testimony and also to cast doubt on the proposition that Jami White's allegations were independent of her mother's influence. White also argues that Detective McKinley's objectivity was impeachable and that the defense should have been able to show that McKinley had a motive for failing to preserve Tina White's diary as evidence and for failing to investigate the possibility that the accusations were not based in truth.

White notes that Mrs. White admitted at trial that she had taken action to protect her financial assets in connection with filing her divorce action. Other evidence presented indicated that she had prompted Danny on "what to remember" prior to his police interview. We must also consider other factors related to the jury assessment of the evidence, including the fact that Jami remembered additional incidents after her counseling; that no one, including the children's nanny, suspected any such misconduct was occurring; that Jami's diary contained no mention of such abuse; that Jami did not exhibit behavior consistent with sexual abuse until *after*

making the allegations.[2] White argues that evidence of the McKinley relationship would have strengthened White's defense of trying to show that Mrs. White pursued the allegations made by Jami as a divorce strategy, which would have reduced the corroborating effect of Tina White's testimony.

At trial, the parties clearly engaged in conflict over the defense strategy. The prosecution argued:

> So then I guess we have the conspiracy theory here, that Tina manipulated this whole thing. Well, why did Tina manipulate this whole thing? Why did Tina do such a sadistic, vicious thing, as to have her daughter falsely accuse someone, two and a half years of sexual abuse.

Then, later in the argument:

> .... And he wants you to believe that there are reasons why Tina would help Jami, why Tina would help Jami fill in the details, fill in gaps. Well, if Tina was going to help Jami, if that was her goal, and we still haven't figured out why it would benefit Tina White in any way, shape, or form to do such a thing, she would come up with something much better than the things that she was able to testify to.

White's motion asserted that Mrs. White and McKinley became romantically involved early in the investigation, that McKinley has attempted to conceal his relationship with Mrs. White. The motion also asserted that Tina White, in October of 1999, received assets having a value in excess of $550,000.00 in the divorce proceeding. Although the affidavits present limited information and present very little

first-hand information, and there was no hearing on the motion, the State does not deny the existence of the relationship.

The State never called McKinley as a witness at trial. White called McKinley at trial although he was unaware of the relationship. White's attorney questioned McKinley as to why he did not retain Jami's diary as evidence and why he did not explore the possibility that Jami was making false allegations. The only thing that questioning may have produced for the defense was the possible appearance that the investigation was not extremely thorough. White argues that it would have been useful at trial to have had information as to the relationship between Mrs. White and McKinley. The jury might have believed, White argues, that Detective McKinley's judgment in failing to retain or retrieve Jami's diary as potential evidence was affected by this relationship. The jury might also have believed that Tina White pursued a relationship with McKinley in order to have influence in the criminal prosecution. The evidence of the existence of the relationship could have been helpful to the defense—not because the evidence was *itself* exculpatory, but because it would have tended to support the primary theory of the defense—that even if Tina White did not concoct the allegations, the accusations are more likely to be unreliable because of evidence that Tina White supported them, and evidence that she may have sought to have influence in the prosecution for personal reasons. The fact that Detective McKinley did not retain the diary as evidence will perhaps fit into this theory because one does not have to be in law enforcement to know

---

**2.** The defense raised other evidentiary rulings on appeal, some of which related to credibility. Because there are problems with preservation as to some of these issues, they are not addressed herein. And because these matters were excluded from evidence at trial, they are not considered in regard to the issue of the effect of the state's nondisclosure on the verdict.

that it would not be routine to review the diary and then return it to the complaining witness. The fact that the State did not call McKinley as a witness does not change the fact that White sought to impeach the police work done in the case, and therefore had to call McKinley to the stand himself in order to ask about the diary, the lack of pursuit of the possibility of false accusations, and other matters. White's question at McKinley's deposition about McKinley's possible personal interest in the case was presumably related to a defense concern as to the thoroughness of the investigation. Thus, we conclude that if the facts actually appear as asserted in the motion, there was material impeachment evidence that the defense was denied by the suppression of this information.

■ The remaining question is the probable effect on the verdict of the suppression of the information. White argues that in this case, where some of the allegations seemed implausible and the corroboration of Jami's testimony was very limited, there was a substantial probability that the result would have been different if the information had been disclosed. White argues that the information was of sufficient import that the lack of disclosure deprived White of a fair trial and undermined confidence in the verdict, citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). We agree. Under the unique circumstances of this case, and for the reasons discussed above, we believe the defense would have been able to develop a cogent theory for the admissibility of the evidence as to the relationship. Although evidence as to the relationship presents the danger that a jury would be distracted or confused from the essential issue of guilt or innocence, it is unlikely, given the particulars of this case, including the importance of Tina White's testimony and role in the case, and the potential

effect of the relationship on the thoroughness of the investigation, that the evidence would be excluded. The court's instructions and the careful arguments of the State would, of course, help keep the jury from being misled as to the significance of the evidence. However, despite the danger that the information could be misused, we conclude that, if the actual facts of the relationship, including the timing of the relationship in relation to the investigation, are as assumed, the court will decide the evidence is properly admissible. If the facts are indeed as asserted in the motion for new trial, we conclude, from our limited vantage point, that the introduction of such information to impeach the police work and to impeach Tina White would be reasonably likely to affect the result of the trial.

The prosecution unfortunately jumped to the assumption that the relationship was immaterial because the relationship arose after the accusations were made. This assumption that it was immaterial was not correct, however, as a little reflection reveals, because the relationship itself raises a question concerning Tina White's role in the whole matter. In order for the defense to benefit from the information of the relationship, the defense need only cause the jury to believe that there is a reasonable possibility that even if Tina White did not originate the allegations, she assisted and encouraged them, arguably modified her own testimony to support the allegations, and participated in other ways, such as in causing the loss of the diary.

■ While the prosecution had no malevolent intent here, the lack of a malevolent intent is immaterial in determining whether the defendant received a fair trial. *Aaron*, 985 S.W.2d at 436; *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. The defense, in McKinley's deposition, clearly sought to determine whether the chief in-

vestigator had any personal interest in the matter. The State failed to correct McKinley's inadequate answer. The defense was denied information in discovery to which it was entitled. The duty of the State to disclose evidence favorable to the defendant is grounded on the obligation to seek justice, not merely to convict. *State v. Ghan*, 721 S.W.2d 128, 132 (Mo.App. 1986). Not only was the information "of a kind which any capable trial lawyer would like to have," *Hayes v. State*, 711 S.W.2d 876, 880 (Mo. banc 1986), but it was also information which the defense had specifically sought and been denied. We conclude that the trial court abused its discretion in summarily denying the motion for new trial.

Because the facts asserted in the motion for new trial, though not detailed and though asserted only by affidavit, were not denied by the State, we believe it is unnecessary to remand for a factual hearing on the motion for new trial.

### Conclusion

The State's motion to dismiss is denied. In the particular circumstances of this case, the State's intentional decision to withhold the information in question sufficiently undermines confidence in the verdict that it was an abuse of discretion for the trial court to deny the motion for new trial. The judgment is reversed and the matter is remanded to the trial court for a new trial. As for the other evidentiary issues raised by Mr. White, we refer the parties to the authorities discussed in their briefs.

LOWENSTEIN and ELLIS, JJ., concur.