# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1945

_____

Theodore W. White Jr.,              *
                                         *

         Appellee,            *
                                         *   Appeal from the United States

     v.                       *   District Court for the
                                         *   Western District of Missouri.

Detective Richard McKinley,      *
Individually and in his official capacity, *
                                         *

         Appellant,          *
                                         *

Tina McKinley,             *
                                         *

         Defendant.        *

_____

Submitted: January 12, 2010
Filed: May 17, 2010

_____

Before SMITH and COLLOTON, Circuit Judges, and KORNMANN,[1] District Judge.

_____

SMITH, Circuit Judge.

Theodore White, Jr. brought this civil action following his prosecution, conviction, re-prosecution, and eventual acquittal for the alleged molestation of his adopted daughter. White sued his ex-wife, Tina McKinley ("Tina"), and Richard

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota, sitting by designation.

McKinley, the police officer who investigated the molestation charges and Tina's current husband. White alleged a deprivation of his constitutional rights and various common law torts. McKinley moved for summary judgment on all counts, claiming qualified immunity.[2] The district court[3] denied McKinley's motion as to the (1) 42 U.S.C. § 1983 conspiracy claim and (2) § 1983 claim based on suppression of exculpatory evidence.[4] On interlocutory appeal, we affirmed the district court's denial of summary judgment. *White v. McKinley*, 519 F.3d 806 (8th Cir. 2008) ("*White I*"). At trial, the jury found that McKinley violated White's due process rights and conspired with Tina in violating White's rights, and it assessed actual damages of $14 million and punitive damages against both McKinley and Tina of $1 million each. McKinley appeals,[5] arguing that the district court erred in denying his (1) motion for judgment as a matter of law because he disclosed potential impeachment evidence to the prosecutor who intentionally withheld the information from White and (2) motion for a new trial because the district court improperly excluded large categories of evidence from the jury's consideration. He also asserts that the punitive damages award of $1 million is excessive and violates his due process rights in light of his net worth of $31,000. We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdicts." *United States v. Hayes*, 574 F.3d 460, 465 (8th Cir. 2009) (internal quotations and citation omitted).

---

[2]Tina also moved for summary judgment on all counts.

[3]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[4]The district court denied Tina's motion as to the (1) § 1983 conspiracy claim, (2) false arrest claim, and (3) malicious prosecution claim.

[5]Tina did not appeal the adverse judgment.

White married Tina in 1991. At that time, Tina had custody of her two children—Jami and Danny—from a previous marriage. White agreed to adopt Jami and Danny, but their biological father initially would not agree to the termination of his parental rights. In 1995, the biological father changed his mind and permitted White to adopt both children. When an acquaintance asked Tina why the children's biological father agreed to the termination of his parental rights, Tina replied that she had threatened to charge him with child molestation if he did not cooperate. White adopted Tina's children in January 1996.

Over time, financial difficulties precipitated marital difficulties. The marriage deteriorated in the fall of 1997 and resulted in fights, some of which the children witnessed. On September 24, 1997, while White was gone, Tina and her children packed White's belongings in garbage bags, put the garbage bags in the garage, and barricaded the entrance from the garage to the kitchen. When White returned home, he broke down the door and went to his bedroom. Tina contacted the Lee's Summit Police Department ("the police department") to report that White had broken through the door but added a fictitious story that he shoved her. Because both Jami and Danny were with Tina when she heard the garage door opening, they were present when White entered the kitchen and knew that Tina's report was false.

A few days after the incident, Nina Morerod, the family's nanny, saw McKinley at the family's house. Tina had told Morerod that someone was coming to repair the door.[6] While Morerod was at Tina's home, two men came to the home to measure the door and prepare an estimate for repair of the broken door frame. Morerod testified that she talked to only one of the men, whom she identified as McKinley. On March 21, 1998, Tina reported to the police department that White had been molesting Jami,

---

[6]McKinley admitted at trial that he had a side business painting houses.

then age 12, for years. McKinley was assigned as the lead investigator, which was the role that he usually took in sexual abuse investigations for the police department.

During his investigation, McKinley found Jami's diary. Jami wrote in her diary that White was a good father and that she wished that he would spend more time with her. She also wrote that Tina did not love her the way that she loved her sons and that Tina could not even put her arms around Jami. In the diary, Jami stated that she hated her mother for making her responsible for babysitting her younger brother. The standard practice for a detective who discovers such a writing in the course of investigating child sexual abuse allegations is to seize it and preserve it as evidence. Nevertheless, McKinley failed to seize it. In his police report, McKinley failed to mention that he had read the diary, thereby omitting from the report Jami's potentially exculpatory statement about White being a good father. Thereafter, the diary disappeared. Prior to the criminal trial, White's attorney requested that the prosecutor provide the diary as evidence for the defense. Jennifer Mettler, the prosecutor, then called Tina, told her that White wanted the diary, and asked her to get it. Tina subsequently informed Mettler that Jami no longer had the diary. However, Jami contradicted Tina. Jami denied that she was ever asked to look for the diary and did not recall seeing her diary after McKinley had it. According to Jami, Tina knew where Jami kept the diary.

As part of his investigation, McKinley also took the unusual step of meeting with Jami and discussing the sexual abuse allegations with her in advance of the required interview by the Center for Protection and Children (CPC). A meeting between a detective and a child witness before the CPC interview is improper and violates a "very serious" rule for the police department's detectives. All cases of alleged child molestation in Jackson County are referred in the first instance to the CPC. Detectives must not interview the child until after the CPC exam, as the CPC interviewers are specially trained to take a statement from the child about the abuse allegations. The interview is also videotaped and used as evidence at the criminal trial. The CPC records interviews so that all parties can observe whether the interviewer

-4-

asked leading questions. For similar reasons, a detective must document his or her contacts with the child and must not have an undocumented meeting with a child. McKinley never disclosed his pre-CPC meeting to the prosecutors.[7]

In June 1998, McKinley disclosed to the police department's chief of police that McKinley was investigating a child sexual abuse case and had begun a relationship with the mother of the victim. The chief directed McKinley to disclose his relationship with Tina to the prosecutor. McKinley then informed Prosecutor Jill Kanatzar that he had a one-time social encounter with Tina that occurred *after* charges were filed against White in April 1998. At that time, McKinley did not disclose to Kanatzar that he had actually been on several dates with Tina and was having a sexual relationship with her.

At the end of June 1998, Kanatzar left the prosecutor's office, and Mettler replaced Kanatzar on the case. During the fall of 1998, near White's first trial setting, Mettler met with Tina and questioned her about her relationship with McKinley. Mettler asked Tina about "the one or two times" that McKinley and Tina had dated. In response, Tina stated that she and McKinley were presently seriously dating and were planning on marrying. Mettler reported that information to her superiors in the prosecutor's office. The prosecutor's office determined that it was unnecessary for Mettler to disclose to the defense the existence of the relationship because, *based on McKinley's and Tina's representations*, "the relationship had not begun until after the case was already filed and charges had been filed." McKinley and Tina had told Mettler that there was no connection between the two of them prior to the investigation and that the relationship did not start until after the investigation was completed. They had also told Mettler that Tina's children did not know that she was

---

[7]McKinley maintained, contrary to Jami's testimony, that he did not conduct a pre-CPC interview of Jami. But he admitted that if he had conducted a pre-CPC interview, he should have reported it to the prosecutor.

dating McKinley and that they were taking steps to keep such information from the children.

At trial, Tina's coworker, Claudia Baker, and Tina's supervisor, Kevin Huffman, contradicted McKinley and Tina's account. According to Baker, in the fall of 1998, Tina told her that she was getting a divorce and that she was dating "a cop from Lee's Summit." Tina told Baker that she spent time with the police officer in her home and that she was having a relationship with him because "he was helping her to get a divorce from her husband, to get rid of him." Tina also informed Baker that Tina's relationship with the police officer was sexual. According to Baker, Tina spoke of her relationship with the police officer openly and was "sort of bragging" about it.

According to Huffman, Tina spoke with him about her pursuit of a criminal case against White for molesting her daughter. She told Huffman that she had a boyfriend named "Curt Cox." Tina told Huffman that "Curt" was a good influence on her children and was teaching her son how to fix motorcycles and helping her daughter with her homework. "Curt" was the code name that Tina and the children used to refer to McKinley. Huffman also noticed that Tina would wear an army jacket to work with the name "McKinley" on it.

White was tried three times in Missouri state courts for the alleged molestation of Jami. At his first trial, the jury convicted White of 12 counts of sexual molestation. Before his sentencing, White fled to Costa Rica where he was apprehended and eventually returned to Missouri.[8] "White learned after the verdict that Tina White and the chief investigator of the alleged crime [McKinley] had been engaged in a romantic relationship. White also learned that the prosecution knew about the relationship for

_____

[8]Because White fled the jurisdiction prior to sentencing, Missouri's escape rule presumably applied. This rule precludes any appeal when a defendant has fled the jurisdiction after conviction but before sentencing. But the Missouri Court of Appeals waived the rule and permitted White to appeal his conviction because of evidence that was uncovered after his conviction.

approximately one year but failed to disclose the information to the defense." *State v. White*, 81 S.W.3d 561, 566 (Mo. Ct. App. 2002).

The Missouri Court of Appeals determined that evidence of the romantic relationship between Tina and McKinley during the investigation "was material impeachment evidence that the defense was denied by the suppression of this information." *Id.* at 570. The court also addressed McKinley's discovery of Jami's diary and his failure to seize it as evidence, stating that "one does not have to be in law enforcement to know that it would not be routine to review the diary and then return it to the complaining witness." *Id.* at 569–70. Because the State violated its duty to disclose evidence favorable to the defense, the court set aside White's conviction and remanded the case for a new trial.[9]

White filed the instant § 1983 action against McKinley and Tina, alleging that McKinley deprived him of procedural due process by not preserving the diary as evidence and not disclosing his romantic involvement with Tina. He also asserted a claim for conspiracy to violate § 1983 against McKinley and Tina, asserting that they conspired to deprive him of procedural due process.[10] Prior to trial, McKinley moved for summary judgment, claiming that he was entitled to qualified immunity. Tina also moved for summary judgment. The district court denied qualified immunity, and McKinley filed an interlocutory appeal with this court.

---

[9]White's second trial resulted in a hung jury—11 jurors in favor of acquittal and one in favor of conviction. At his third criminal trial, in January or February 2005, White was acquitted. Having remained incarcerated post-appeal and throughout the second and third trials, White was released from custody in February 2005.

[10]White also filed claims based on other constitutional torts and various common law torts, and the district court granted summary judgment in favor of McKinley and Tina on the constitutional claims. White eventually dismissed the common law claims. The City of Lee's Summit, McKinley's employer, settled with White early in the litigation.

Because there were disputed issues of fact concerning McKinley's state of mind, we affirmed the district court's denial of summary judgment and remanded for trial. *White I*, 519 F.3d at 813–14.

At trial, the jury found in White's favor on both counts, assessing actual damages of $14 million and punitive damages against both McKinley and Tina of $1 million each. McKinley subsequently filed a motion for judgment as a matter of law, a motion for a new trial, and a motion to alter or amend the judgment. The district court denied all motions.

## II. *Discussion*

On appeal, McKinley raises three arguments. First, he argues that the district court erroneously denied his motion for judgment as a matter of law because any violation of White's rights occurred because the prosecutor intentionally withheld the information from White. McKinley contends that he appropriately disclosed the potential impeachment evidence to the prosecutor. Second, he asserts that the district court should have granted his motion for a new trial because the court erroneously excluded substantial material evidence from the jury's consideration. Finally, he contends that the punitive damages award of $1 million is excessive and violates his due process rights because his net worth is only $31,000.

### A. *Motion for Judgment as a Matter of Law*

First, McKinley argues that we should reverse the judgment because it imposes liability against a law enforcement official for failure to disclose potentially exculpatory impeachment evidence when the duty to disclose such evidence runs from law enforcement to the prosecutor. According to McKinley, he told the prosecutor that he had seen Tina on one or two occasions after his investigation into Tina's allegations against White concluded; in turn, the prosecutor, not McKinley, made the decision not to disclose such information to White on repeated occasions, including when McKinley was deposed for and testified at the first criminal trial.

In response, White contends that McKinley's appeal is an attempt, contrary to this court's prior ruling, to relitigate the liability issue. According to White, this court has already considered the prosecutor's nondisclosure of the relationship and found that McKinley would nonetheless be liable if he misrepresented the nature and length of the relationship. In the alternative, White asserts that even if McKinley could relitigate the liability issue, the evidence shows that McKinley lied to the prosecutor about matters that were fundamental to the prosecutor's assessment of the relationship because McKinley misrepresented the relationship as not beginning until after the charges against White had been filed and as being unknown to the children. White also notes that McKinley's argument fails because it ignores the jury's finding that he destroyed the diary and covered up other exculpatory evidence in the course of the conspiracy.

Here, McKinley is not challenging the sufficiency of the evidence; instead, he is arguing that, as a matter of law, he cannot be held liable because it was the prosecutor's failure to disclose the existence of the relationship between McKinley and Tina that violated White's civil rights. We review de novo a district court's denial of a motion for judgment as a matter of law, "viewing the evidence in the light most favorable to the verdict." *Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 640 (8th Cir. 2009).

We previously held that genuine issues of material fact existed regarding whether McKinley acted in bad faith in deliberately withholding from the prosecution the full extent of his romantic relationship with Tina and in failing to preserve Jami's diary—which did not corroborate the molestation allegations—thereby precluding summary judgment on the basis of qualified immunity. *White I*, 519 F.3d at 813–14. We then found that the facts, as alleged by White, satisfied the "bad faith standard." *Id*. at 814.

We agree with White that McKinley is essentially attempting to relitigate the issue of qualified immunity. In light of our prior holding, and viewing the facts in the

light most favorable to the jury's verdict, a reasonable jury could have concluded that McKinley's misrepresentation of his relationship with Tina to the prosecutors and failure to preserve the diary was done in bad faith. As the district court correctly observed:

> Detective McKinley's argument that a police officer has no obligation to preserve exculpatory evidence if he tells the prosecutor about it is also contrary to the Eighth Circuit's opinion in this case. The Eighth Circuit held that a police officer is responsible if he withholds the evidence in bad faith. Furthermore, there is ample evidence that Detective McKinley did not truthfully tell the prosecutor about the evidence he now claims to have revealed.

*White v. McKinley*, No. 05-0203-CV-W-NKL, 2009 WL 813001, at *4 n.7 (W.D. Mo. March 26, 2009) (slip copy) ("*White II*").

Accordingly, we hold that the district court did not err in denying McKinley's motion for judgment as a matter of law.

## B. *Motion for a New Trial*

Second, McKinley argues that the district court should have granted him a new trial because it erroneously excluded evidence of (1) White voluntarily fleeing to Costa Rica for nearly a year after his conviction but prior to sentencing; (2) the full extent of McKinley's investigation and what was provided to the prosecutors; and (3) the reasons for the prosecutors' conduct in repeatedly failing or refusing to disclose potentially exculpatory impeachment evidence and their conduct and reasons for stopping McKinley from revealing the evidence. According to McKinley, the district court's failure to permit such evidence prejudiced him when the jury was asked to determine whether he acted in bad faith.

In response, White asserts that the district court *did not* exclude most of the evidence that McKinley now claims was excluded. Moreover, White argues that the

-10-

district court's exclusion of such evidence was well within its discretion. According to White, the district court admitted relevant evidence and excluded evidence that was not probative or was so marginally probative that it would not justify admission under Federal Rule of Evidence 403. And, White contends that McKinley identifies nothing that raises any substantial concern that the jury would have decided the case differently.

"We review a district court's denial of a motion for new trial with great deference, reversing only if the district court clearly abused its discretion." *Wilson v. City of Des Moines*, 442 F.3d 637, 640 (8th Cir. 2006). "When a motion for new trial is based on rulings regarding the admissibility of evidence, the district court will not be reversed absent a clear and prejudicial abuse of discretion." *Id*. at 640–41(internal quotations and citations omitted). Only if the excluded evidence "is of such a critical nature that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted has a district court so abused its discretion." *Id*. at 641 (internal quotations and citations omitted).

### 1. *White's Flight to Costa Rica*

McKinley maintains that the district court improperly restricted evidence of White's absconding to Costa Rica because it was relevant to causation and damages. According to McKinley, White asked the jury to find liability and award him damages based on evidence that he was wrongfully convicted and imprisoned and suffered for six years, deprived of his children, family, and income. McKinley asserts that the jury should have heard evidence that White fled the United States after his conviction but before he was sentenced. McKinley contends that such evidence was relevant to whether White proved that McKinley's failure to preserve the diary and failure to disclose the relationship caused White's incarceration. According to McKinley, such evidence was also relevant as to White's alleged damages. McKinley argues that the jury was given an incomplete and misleading account of White's suffering.

-11-

"Federal Rule of Evidence 403 . . . provides that . . . '[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *United States v. Keiser*, 578 F.3d 897, 904 (8th Cir. 2009) (quoting Fed. R. Evid. 403). Here, the district court excluded evidence of White's flight to Costa Rica and his Costa Rican incarceration and permitted only evidence of White's incarceration in the United States. This ruling was not an abuse of discretion, as the district court "considered the probative value versus the prejudicial impact of [White's] flight and Costa Rican prison conditions, as well as the collateral nature of evidence that White would not have been incarcerated absent the flight." *White II*, 2009 WL 813001, at \*13. The district court "found that it was speculation to say that White would not have been incarcerated in the United States absent his flight, *particularly in the absence of testimony by White's criminal trial judge, or comparable rulings in any Missouri court, or expert testimony*." *Id.* (emphasis added). The district court noted that McKinley failed to offer any "actual evidence—expert or otherwise—that White, a convicted child molester, would have been released on bond pending his re-trial." *Id.* The district court's finding is buttressed by § 547.170 of the Missouri Revised Statutes, which prohibits bail during an appeal if the defendant was

convicted of a sex crime involving a person under 17 years of age.[11] Here, White was convicted of just such an offense in his first trial.

As to the length of White's incarceration, the district court only "allowed evidence of White's incarceration in the United States." *White II*, 2009 WL 813001, at *13. The jury was also instructed that White was free until his sentencing in January 2000. Therefore, the only issue is the amount of time White was incarcerated from the date of his sentencing until his release.

During opening arguments, White's attorney stated that White was "going to tell you about what it was like to spend six years—" McKinley's counsel interrupted, objecting to that statement, and the district court sustained the objection. White's attorney then corrected himself, saying, "To spend over five years trying to learn how to survive in hell on earth." During direct examination, White's counsel asked White

---

[11]Section 547.170 of the Missouri Revised Statutes provides:

> In all cases where an appeal or writ of error is prosecuted from a judgment in a criminal cause, *except* where the defendant is under sentence of death or imprisonment in the penitentiary for life, . . . or where the defendant has entered a plea of guilty to or been found guilty of any sexual offense under chapter 566, RSMo, where the victim was less than seventeen years of age at the time the crime was committed, any sexual offense under chapter 568, RSMo, where the victim was less than seventeen years of age at the time the crime was committed, or any pornographic offense involving a minor as set forth in sections 573.023, 573.025, 573.035, 573.037, and 573.040, RSMo, any court or officer authorized to order a stay of proceedings under the preceding provisions may allow a writ of habeas corpus, to bring up the defendant, and may thereupon let him to bail upon a recognizance, with sufficient sureties, to be approved by such court or judge.

(Emphasis added.)

about "serv[ing] out [his] over five years." McKinley's counsel did not object. Thereafter, Kurt Krueger, an economist testifying on White's behalf, testified as to the calculations that he had prepared of White's lost earnings capacity in 2006. Based on Krueger's report, White would have been making $80,000 a year as an above-average insurance salesperson in 1999. When asked what that number would have been in 2006, Krueger replied that it would have been $106,000. White's counsel then stated, "Now, Mr. White was in prison from 1999 to 2005." At that point, McKinley's counsel interrupted and asked to approach the bench. McKinley's counsel explained that he had "a problem with this number from the standpoint that it concludes [sic] the year that [White] was gone. He was only in prison for five years. So these figures are, you know, obviously not correct." The district court advised McKinley's counsel that he could make that argument. On cross-examination, the following exchange occurred:

Q. [By McKinley's Counsel]: And your figures would be a little different if, in fact, he was only in prison for five years.

MR. McCALLISTER [White's counsel]: Your Honor, I object. Assumes facts not in evidence.

THE COURT: Please approach.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: I've been wondering about this.

MR. McCALLISTER: This assumes facts not in evidence.

THE COURT: Are you asking the jury to return economic losses while he was, in fact, not in the United States?

-14-

MR. McCALLISTER: No. That's why we calculated starting January of 2000, and Mr. Ensz [McKinley's counsel] knows that. And we had a discussion about that last night before today's proceedings.

THE COURT: Mr. Ensz, shame on you.

MR. ENSZ [McKinley's counsel]: Well, I'm looking—I mean, this is the figure I'm looking at. And he's got a 1999—

THE COURT: Did Mr. McCallister tell you that last night?

MR. ENSZ: He told me he was going to give me new calculations.

THE COURT: He just made a statement. Did he tell you that, or did he not? Answer the question asked you.

MR. ENSZ: I don't think he told me that last night.

MR. McCALLISTER: I put two charts on his chair this very morning that start with the year 2000 that I showed the jury on the Elmo.

THE COURT: *Are you representing to the court that none of your figures are taking into account the time that he was out of the country*?

MR. McCALLISTER: *That's correct*.

THE COURT: Do you have evidence to show otherwise, Mr. Ensz? You don't need to do it now.

MR. ENSZ: It shows 1999, that's all I'm saying. Maybe he gave me something else and I didn't see it.

THE COURT: We'll talk about that issue later. But as to your objection, I will sustain it.

MR. McCALLISTER: Your Honor, also, I would ask that the jury be instructed not to—to disregard his comment about that.

THE COURT: His last statement.

(The following proceedings were had in open court:)

THE COURT: I'll instruct the jury to disregard the last statement by Mr. Ensz. Any further questions?

MR. ENSZ: I have no further questions.

(Emphasis added.)

During closing argument, White's counsel stated that

Matt O'Connor, a friend of [White's], an attorney that believed in him and wanted to help him, sat across the table from that man. That man swore to tell the truth, looked him in the eye, and lied to him. *And then he has to spend five and a half years* feeling that he let his friend down, sent him off to hell in a maximum security prison."

(Emphasis added.) White's counsel also stated that White "spent five and a half years in prison." He then suggested a number to the jury of "$3 million a year for five and a half years in prison." Finally, he stated, "Well, if you find, again, that he shouldn't have been in prison and he is entitled to money, then I've given you a figure of five hundred and—he was there five and a half years. That's $550,000, plus this figure of $56,849.97."

Viewing the transcript in the totality, we conclude that the jury was properly instructed that White only spent five-and-a-half years in prison pending appeal—the time in which he was incarcerated in the United States.

Therefore, we hold that the district court did not abuse its discretion in excluding evidence of White's flight to Costa Rica.

### 2. *Prosecutor's Conduct During McKinley's Deposition*

McKinley next contends that the district court erroneously excluded evidence regarding the prosecutor's conduct during McKinley's deposition and her subsequent conversation with McKinley regarding whether any of the questions asked called for disclosure of McKinley's relationship with Tina. According to McKinley, the district court erroneously prohibited the jury from hearing the prosecutor's testimony that McKinley was worried before and after the deposition about whether the questions called for disclosure of the relationship and whether she thought that his answers were appropriate.

As the district court correctly observed "Detective McKinley testified at length concerning his deposition testimony; he testified that it was truthful and offered an explanation for how it could be interpreted as such; his lawyer argued his explanation in closing." *White II*, 2009 WL 813001, at \*15 (citing Tr. at 576–89, 1677–86, 1692–94, 1784–85, 2035–36). McKinley also testified that Prosecutor Mettler and he discussed whether he should disclose the relationship during the deposition and that he told her that he wanted to disclose the relationship. In turn, Prosecutor Mettler testified regarding her recollection of meeting with McKinley to prepare him for the deposition. When asked by McKinley's counsel why McKinley wanted to disclose his relationship with Tina, Prosecutor Mettler responded, "I don't recall him saying that he necessarily wanted to provide the information. I recall him being perfectly willing to provide it, not having any qualms whatsoever about providing the information. That's what I recall. I don't recall him asking to provide it."

The district court, however, did prohibit testimony regarding Prosecutor Mettler's *reaction* to the answers that McKinley gave during the deposition. The court prohibited Prosecutor Mettler from testifying as to "anything she said or did during the course of the deposition." The court "permit[ted] testimony that she was there at his deposition, but [it] [would] not permit anything beyond that point." In explaining its ruling, the district court stated:

> Nothing, nothing about after the deposition. And here is why, Mr. Ensz. I agree there is some small modicum of relevancy to that on his issue of good faith, but it is far outweighed by the fact that that will invade the province of the jury in deciding whether the question called for a particular answer. She is not appropriately the one to make that decision. It is a decision for the jury. So it will not be permitted in.

We hold that the district court did not abuse its discretion in prohibiting McKinley from eliciting testimony from Prosecutor Mettler as to whether McKinley had testified correctly during his deposition, as the jury heard McKinley's own testimony that he believed that he had testified correctly. Prosecutor Mettler's bolstering of such testimony would have added nothing consequential to the record.

3. *Full Extent of McKinley's Investigation/Prosecutors' Testimony as to Why They Charged White*

McKinley also asserts that the district court erroneously excluded testimony from the prosecutors involved in bringing the original charges against White and pursuing the three criminal trials. According to McKinley, the district court should have permitted the prosecutors to recount the evidence they reviewed before deciding to pursue the criminal trials. Additionally, he argues that the district court erroneously excluded evidence of his own investigation, which was relevant to causation. McKinley maintains that he was limited to trying to defend himself against the accusations that he acted in bad faith by failing to preserve the diary and in failing to disclose the true nature and extent of his relationship with Tina.

In denying McKinley's motion for a new trial, the district court addressed McKinley's assertion that the court should have permitted him to introduce evidence of the entirety of the investigation to demonstrate the thoroughness and quality of the investigation, stating:

> White may have been guilty and Detective McKinley may have conducted an otherwise acceptable investigation, but if he deliberately suppressed or failed to preserve specific evidence in bad faith, he violated White's right to a fair trial. The fact that Detective McKinley thoroughly investigated Jami's complaint does not indicate that he had a good faith reason for not securing the diary or failing to reveal to the prosecutor his true relationship with Tina. Evidence that Detective McKinley revealed other exculpatory proof would logically show that his omission as to the diary, relationship and PCP exam was unintentional; but doing a good job to find evidence that tended to prove White's guilt does not. Indeed, showing that he conducted a thorough investigation, except for leaving the diary with the complaining witness, failing to document pre-CPC interview and making misleading statements about his relationship with Tina, would tend to show he was acting in bad faith, not good faith; i.e., he knew how to conduct a thorough exam but chose not to when it came to exculpatory evidence.
>
> Finally, the inflammatory and collateral nature of the investigation evidence—which was, in essence, evidence of White's guilt—would have far outweighed any probative value in showing that Detective McKinley's investigation was thorough.

*White II*, 2009 WL 813001, at *15–16 (footnote omitted).

We hold that the district court did not abuse its discretion in prohibiting such evidence, as admittance of the evidence would have created a mini-trial on White's actual guilt, which is not the subject of a § 1983 action. Rather, the question for the jury was whether White received a fair trial. *Brady v. Maryland*, 373 U.S. 83 (1963), does not require the plaintiff to show that the jury in his criminal trial would have acquitted him or that he was innocent. "'The question is not whether the defendant

would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

And, the district court also addressed its decision to prohibit the prosecutors involved in White's criminal trials from testifying about the evidence on which they relied, their follow-up investigations, and their positions with regard to disclosing the relationship between McKinley and Tina, stating:

> Though Detective McKinley's argument implies that the Court did not allow any evidence of the prosecution, the Court did allow Detective McKinley to introduce prosecutorial evidence which was probative of the issues in this, as opposed to the criminal case. Furthermore, even if the excluded evidence had come in, the Court does not believe it would have changed the outcome of the case. The prosecutors did not know all the evidence submitted in the civil case and Detective McKinley's and Tina's testimony was sufficiently unbelievable that a jury would have found bad faith even if the prosecutors had been allowed to testify about their belief that the evidence was not exculpatory, particularly in light of the Missouri Court of Appeals opinion.

*White II*, 2009 WL 813001, at *18.

We find no abuse of discretion in the district court's decision to exclude the prosecutors' testimony about the evidence upon which they relied in prosecuting White. Again, the issue is not whether White is actually guilty or innocent, but whether McKinley violated White's civil rights. *See Whitehill*, 532 F.3d at 753.

### C. *Punitive Damage Award*

Third, McKinley argues that the punitive damages award of $1 million is excessive and violates his due process rights in light of his net worth of only $31,000.

In his reply brief, McKinley concedes that he did not raise the issue before the district court but argues that this court should grant plain error relief because the error in the award is plain, his rights are substantially affected, and the award represents a miscarriage of justice.

Because McKinley failed to challenge the punitive damages award in his post-trial motion, we review for plain error. "Under plain error review, the defendant must show: (1) an error; (2) that is plain; and (3) that affects substantial rights." *United States v. Williams*, 590 F.3d 616, 619 (8th Cir. 2010) (internal quotations and citations omitted).

Regarding punitive damages, "the most important factors to consider in a due process analysis include 'the degree of reprehensibility of the defendant's conduct' and the 'ratio [of punitive damages] to the actual harm inflicted on the plaintiff.'" *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 362 (8th Cir. 2009) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 580 (1996)). "A high ratio may be appropriate based on particularly reprehensible conduct or where actual damages are nominal." *Id*. But "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*. (internal quotations, alteration, and citation omitted). "In the absence of extremely reprehensible conduct against the plaintiff or some special circumstance such [as] an extraordinarily small compensatory award, awards in excess of ten-to-one cannot stand." *Id*. at 362–63 (internal quotations and citation omitted).

Here, the jury awarded White $14 million in actual damages, while the punitive damages award was $1 million. The punitive damages award amounted to approximately seven percent of the actual damages. Therefore, we see no plain error in the punitive damages award.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____